## In re SUGARHOUSE REALTY, INC.

Civil A. No. 95–2156.
Bankruptcy No. 92 23024.

United States District Court,
E.D. Pennsylvania.

Jan. 17, 1996.

**358**

Allen B. Dubroff, Astor, Weiss & Newman, Philadelphia, PA, for Sugarhouse Realty, Inc., Sugarhouse II Corp., Riverfront Concepts, Inc.

Nicholas J. Le Pore, II, Carl A. Solano, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for LHTW Corp.

Anna Hom, Spector, Gadon & Rosen, P.C., Philadelphia, PA, for First Lehigh Bank.

Susan Dein Bricklin, U.S. Attorney's Office, Philadelphia, PA, David E. Street, Department of Justice, Environmental Enforcement Section, Washington, DC, for U.S. Environmental Protection Agency.

Frederic J. Baker, Asst. U.S. Trustee, Philadelphia, PA, pro se.

### MEMORANDUM

CAHN, Chief Judge.

Let's Hope This Works Corporation ("LHTW"), purchaser of Sugarhouse Realty, Inc.'s ("Sugarhouse Realty") property under a confirmed bankruptcy plan of reorganization, appeals the bankruptcy court's order granting First Lehigh Bank's ("First Lehigh") Motion to Compel LHTW Corporation to Close Under Agreements of Sale Necessary for Consummation of Confirmed Plans of Reorganization Pursuant to 11 U.S.C. § 1142 ("Motion to Compel").[1] This court has jurisdiction pursuant to 28 U.S.C. § 158(a) (1988). For the reasons set forth below, this court affirms the order of the bankruptcy court.

### I. FACTS AND PROCEDURAL HISTORY

The facts of this case were fully set forth in the bankruptcy court opinion, *In re Sugarhouse Realty, Inc.*, Nos. 92–23024 SR, 92–24533 SR, 93–22920 SR, 1995 WL 114151 (Bankr.E.D.Pa., March 15, 1995). A summary of the facts relevant to this proceeding follows.

This case involves three tracts of real property contiguously situated along the west side of the Delaware River in Philadelphia, commonly known collectively as the former Jack Frost Sugar Refinery Site (the "Site"). The Site consists of approximately 30 acres of land including the remains of the hundred-year-old multi-building sugar refinery. The Site has a lengthy history of environmental litigation.[2] The three tracts of

---

1. References to testimony at the hearing on the Motion to Compel before Judge Raslavich will be designated as: NT [date] at [page].

2. The Environmental Protection Agency (the "EPA") commenced litigation in 1985 to compel the Debtors to remediate Polychlorinated Biphe-

nyl containing matter ("PCBs"). In 1991, the City of Philadelphia commenced litigation to compel the Debtors to remediate hazardous asbestos, secure the Site from the public, and remove underground storage tanks (USTs) in accordance with environmental regulations. The Army Corps of Engineers has also cited the Debt-

land are owned by three separate corporate debtors (collectively, the "Debtors"). The largest tract is owned by Sugarhouse Realty; the smaller tracts are owned by Sugarhouse II Corporation ("Sugarhouse II") and Riverfront Concepts, Inc. ("Riverfront Concepts"). William Thayer ("Thayer") is the principal stockholder of all three corporations. Royal Bank of Pennsylvania ("Royal Bank") claims a first mortgage lien on the Sugarhouse Realty tract. First Lehigh[3] claims first mortgage liens on the tracts owned by Sugarhouse II and Riverfront Concepts.

The Site was purchased by the Debtors with the intent to clean up and develop the property. Their plans were to build condominiums, a marina, retail shops, a heliport, and an entertainment center on the Site. Unfortunately, the real estate recession intervened and the plans for the resurgence of the Delaware River area failed. Sugarhouse Realty fell behind in mortgage payments. Claiming a balance due of approximately $3,300,000, Royal Bank sought to foreclose on the Sugarhouse Realty tract in late 1993. Subsequently, all three Debtors filed for bankruptcy[4] under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 & app. (1994).[5]

Sugarhouse Realty and Royal Bank entered into a stipulation that called for a public auction of all three tracts of land. The auction was to require a minimum bid of $7,000,000. The stipulation also provided for a period after an unsuccessful auction during which the Debtors could attempt to secure a private sale buyer. If both attempts at sale were unsuccessful, Royal Bank would be at liberty to complete the foreclosure sale on February 7, 1994. No bids were received at a December 16, 1993 auction, and no buyers were subsequently located.

In 1993, the public learned that legislation approving riverboat gaming was being considered in Philadelphia. If this legislation passed, licenses would likely be issued in the Delaware Avenue area. Because of the Site's location, passage of the legislation would make the Site economically desirable notwithstanding the debt and environmental contamination. Trump and LHTW[6] became interested in the property. Both were trying to initiate gaming operations in the Philadelphia area. A competitive bidding war ensued. Thayer aligned himself with Trump, thus placing LHTW at a disadvantage.[7] Nonetheless, LHTW retained environmental experts and attempted to enlist a party-in-interest to serve as plan proponent.

Prior to the February 7, 1994 foreclosure sale, Thayer presented evidence to the bankruptcy court of a pending sale to Trump or a Trump-related corporation. The court issued a sixty-day injunction, postponing the foreclosure sale until April 4, 1994, with the condition that the Debtors propose and have confirmed a plan of reorganization prior to

---

ors for violations relating to the filling of wetlands.

**3.** First Lehigh and the EPA will be referred to collectively as "Appellees."

**4.** On April 10, 1995, the three bankruptcy cases, numbers 92–23024 (Sugarhouse Realty), 92–24533 (Sugarhouse II), and 93–22920 (Riverfront Concepts) were consolidated under the docket number 92–23024 (Sugarhouse Realty) for the purpose of appeal.

**5.** All three parcels have creditors in addition to the mortgagees. The EPA is a judgment creditor of Sugarhouse Realty and Thayer, in the amount of $1,119,750 for the failure to remediate PCBs in a timely fashion. *See United States v. Sugarhouse Realty, Inc.*, 162 B.R. 113, 117 (Bankr. E.D.Pa.1993). The City of Philadelphia is a creditor of each of the three debtor corporations for unpaid taxes, rents, fines, and code violations. (Second Amended Disclosure Statement (EPA), LHTW Ex. 58 at 11.) Donald Trump ("Trump"), paid the City approximately $1,249,088.97 in 1994, while he was considering purchasing the Site, and claims to be subrogated to the City's claim against the Debtors in that amount.

**6.** A representative of Greenwood Racing, Inc. received an auction packet for the Site at a gaming conference in 1993 and directed Terrence Everett ("Everett") to investigate purchasing the Site. Everett hired Andrew Gowa ("Gowa") in 1994 to serve as transactional counsel in the matter. LHTW was then formed by Greenwood specifically for the purpose of purchasing the Site.

**7.** The agreement with Trump prohibited Thayer from negotiating with other prospective purchasers. *In re Sugarhouse Realty*, 1995 WL 114151 at *21 (citation omitted).

the sale date.[8] Royal Bank opposed the injunction, arguing that LHTW, a prospective bidder at the February 7 sheriff's sale, would bid an amount sufficient to cover at least the Royal Bank claim.

With time running out, competition between Trump and LHTW increased. Thayer proposed a number of reorganization plans, all focused on a sale to Trump. LHTW frantically sought a party-in-interest to serve as proponent of its plan, and adopted the slogan, "Anything Trump can do we can do better." While Thayer's plan favored the Debtors, the LHTW-authored plan favored creditors.[9] The City of Philadelphia ("the City"), a creditor of all three debtors, became the proponent of the LHTW-authored Plan (the "City Plan").

During the City's disclosure statement hearing, Trump deposited the full amount of the existing tax claim with the City. Accordingly, the City withdrew its plan of reorganization. The EPA, a creditor of Sugarhouse Realty, then stepped forward to assume the City's position as plan proponent for the portion of the City's Plan that concerned the one Sugarhouse Realty tract (the "EPA Plan").

Shortly thereafter, First Lehigh assumed the role of plan proponent for the rest of the City Plan, which concerned the tracts owned by its debtors, Sugarhouse II and Riverfront Concepts (the "First Lehigh Plan"). The sheriff's sale scheduled for April 4, 1994 was postponed after Trump delivered a $1,000,-000 payment to Royal Bank.

The bankruptcy court approved the companion EPA and First Lehigh disclosure statements. The only remaining events were a vote by the classes, confirmation of one of the competing plans—either the Debtors' Plan or the combined EPA and First Lehigh Plans—by the court, and signing of the Agreement of Sale. The plan confirmation hearing was scheduled for April 28, 1994. Prior to confirmation, on April 15, Trump withdrew from his negotiations with the Debtors, and the Debtors were forced to withdraw their plan of reorganization. The Debtors' request for a continuance was denied by the bankruptcy court.

On April 28, 1994, a confirmation hearing took place on the EPA and First Lehigh plans of reorganization. Thayer was opposed to the EPA and First Lehigh plans and had earlier made it clear that he would not be cooperative. The court confirmed the plans after concluding that objections raised by Thayer lacked merit.

In order to proceed without Thayer's cooperation, several unusual provisions were included in the documentation. First, the Agreement of Sale was not executed prior to confirmation of the plan by the court. Sec-

---

8. A brief, simplified explanation of the Chapter 11 bankruptcy process may prove helpful. Under Chapter 11, the debtor must submit to any interested party a summary of the plan and a written disclosure statement containing information reasonably necessary to inform creditors before they vote on the plan. 11 U.S.C. § 1125. The court must approve the disclosure statements before they are sent to creditors. *Id.* Each class of creditors impaired by the plan then votes to accept or reject the plan. *Id.* § 1126. Once confirmed, the plan binds all parties. *Id.* § 1141.

9. Under the LHTW-authored plan, two agreements of sale were drafted—one pertaining only to the tract owned by Sugarhouse Realty and a second for the properties owned by Sugarhouse II and Riverfront Concepts. The second agreement was contingent on the success of the first agreement. Both the LHTW-authored Agreement of Sale and the agreement of sale between Debtors and Trump contained a fixed "front-end" purchase price to be paid at closing as well as a contingent "back-end" payment to be paid only if riverboat gaming were legalized.

To entice both the Debtors and the creditors, LHTW offered a number of things that Trump did not. LHTW offered more money on the front-end payment than Trump and a back-end payment of cash as opposed to Trump's back-end payment of stock. While Trump capped his environmental clean-up liability, LHTW did not. (*See* NT 9/27/94 at 15–16.) If Trump purchased the Site, unsecured creditors would be paid to some extent only if casino gaming were approved, whereas purchase by LHTW would ensure that unsecured creditors were paid.

Sale of all three tracts between Debtors and LHTW called for a fixed purchase price of $10,-000,000 and a contingent back-end payment of $7,000,000. The Agreement of Sale relating solely to the tract owned by Sugarhouse Realty provided for a fixed purchase price of $6,575,000 and a contingent back-end payment of $4,000,-000. (Second Amended Disclosure Statement (EPA), LHTW Ex. 58 at 16.)

ond, the plan proponents (EPA and First Lehigh) were named as attorneys-in-fact for the Debtors with the power to execute all documents on behalf of the Debtors. Third, the order confirming the Plan contained very specific language directing the parties to consummate the transaction.

Shortly after plan confirmation, LHTW sought access to the property. Thayer was uncooperative. LHTW asked First Lehigh's counsel to draft a motion requesting that the court order Thayer to both allow access to the property and execute the agreements of sale. A duplicate motion relating to the Sugarhouse Realty plan was sent to the EPA to file as well. Access to the property was granted and LHTW instructed the attorneys not to file the motions.

Execution of the Agreement of Sale, as directed by the Confirmation Order, was suspended by the Debtors' appeals. However, on July 5, 1994, all appeals were withdrawn. First Lehigh immediately made written demand upon LHTW to proceed to closing. On July 11, 1994, LHTW transmitted a letter to the United States Attorney for the Eastern District of Pennsylvania (counsel for the EPA) purporting to withdraw pursuant to section 3.3 of the Agreement of Sale, citing as a reason the EPA's failure to sign the Agreement of Sale on behalf of Sugarhouse Realty. On July 13, 1994, LHTW sent a follow-up letter enumerating failures of conditions precedent under section 13.2 of the

Agreement of Sale that LHTW believed excused its performance and permitted termination of the agreement. Negotiations between the parties were unsuccessful, and on August 12, 1994, First Lehigh filed the Motion to Compel which is the subject of this appeal. LHTW responded with a motion to dismiss. On March 15, 1995, after lengthy evidentiary hearings before the bankruptcy court, Judge Raslavich issued an opinion and order granting First Lehigh's Motion to Compel.

On appeal of that order to this court, LHTW argues first, that the bankruptcy court erred in holding that the Agreement of Sale does not permit withdrawal after confirmation of the plan by the bankruptcy court ("post-confirmation withdrawal") and, second, that the bankruptcy court erred in holding that LHTW had no right to refuse to close for failures of conditions precedent under section 13.2 of the Agreement of Sale.[10]

 The parties have extensively briefed the issues and, on October 6, 1995, presented thorough oral argument.[11]

## II. STANDARD OF REVIEW

 In reviewing the bankruptcy court's decision, "[f]indings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."[12] Fed.R.Bankr.P. 8013.

---

10. LHTW, in a footnote, still contests the standing of First Lehigh, who is not a creditor of Sugarhouse Realty, but is a creditor of the owners of the two related parcels, the sales of which are expressly contingent upon the sale of the Sugarhouse Realty tract. It is clear under section 1109(b) of the Bankruptcy Code and case law that First Lehigh has standing as a party-in-interest. *See In re Sugarhouse Realty,* 1995 WL 114151, at *6 ("the phrase [party-in-interest] should be construed liberally to achieve greater participation in reorganization cases and to ensure that all persons having a stake ... may appear and be heard....") (citing *In re Amatex Corp.,* 755 F.2d 1034 (3d Cir.1985)); *see also In re Karpe,* 84 B.R. 926, 928–29 (Bankr.M.D.Pa. 1988) (containing an in-depth analysis of the term "party-in-interest" as used in the Bankruptcy Code, and concluding that the determination is to be made by the court). There is no doubt that First Lehigh has a stake—sale of the property owned by its debtors cannot take place until the sale of Sugarhouse Realty. As the bankrupt-

cy court stated, "there could hardly be a better example of an instance where a non-creditor should be accorded standing to appear and be heard." *In re Sugarhouse Realty,* 1995 WL 114151, at *6.

11. The court can affirm the correct decision of a lower court on grounds different than those relied upon by that court. *University of Maryland v. Peat Marwick Main & Co.,* 923 F.2d 265, 275 (3d Cir.1991). It is also settled that the court can affirm on any basis for which it finds support on the record. *Bernitsky v. United States,* 620 F.2d 948, 950 (3d Cir.1980) (citations omitted), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980).

12. A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer,*

However, the bankruptcy court's conclusions of law are subject to plenary review by this court. *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir.1988).

## III. ANALYSIS

### A. *Withdrawal Under Section 3.3 of the Agreement of Sale*

■ The first argument raised by LHTW is that the bankruptcy court erred in holding that it has no post-confirmation right of withdrawal pursuant to the Agreement of Sale. (Brief of Appellant at 24.) Specifically, LHTW points to section 3.3 of the Agreement of Sale and finds fault with the court's interpretation of the term "the latter of." Section 3.3 of the Agreement of Sale reads as follows:

Buyer may, without any liability or obligation whatsoever, withdraw this Agreement of Sale by written notice given to the Plan Proponent of Creditor's Competing Plan at any time prior to the latter of (a) the execution and delivery of the Agreement of Sale by Seller to Buyer, which such delivery must be actually received by Buyer, or (b) the entry of an order by the Court confirming and approving this Agreement and the sale to Buyer of the Property pursuant hereto, providing, however, that the foregoing to the contrary notwithstanding, in no event may Buyer withdraw this Agreement prior to April 4, 1994. Upon withdrawal as provided herein, all Deposits and other monies delivered by Buyer, together with interest earned thereon, shall be returned to Buyer.

(Agreement of Sale § 3.3, LHTW Ex. 24.) The bankruptcy court held that the term was

470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948)). This standard does not permit a court to reverse findings simply because the reviewing court would have decided differently. *Id.* at 573, 105 S.Ct. at 1511. "Where there are two permissible views of the evidence, the factfinder's choice cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. at 1511 (citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179–80, 94 L.Ed. 150 (1949)).

unambiguous and accorded what it found to be the "primary and generally accepted meaning" of the term, "the second of two things mentioned." *In re Sugarhouse Realty*, 1995 WL 114151, at *9. LHTW argues that the term unambiguously means "later in time." (*See* Brief of Appellant at 24.) The import of the bankruptcy court's finding is that LHTW had no right of withdrawal under section 3.3 of the contract because confirmation of the plan, the latter (second of two things mentioned) event, had occurred. The court held, alternately, that even if the term were considered ambiguous, extrinsic evidence would lead to the same conclusion. *In re Sugarhouse Realty*, 1995 WL 114151, at *10. This court affirms the primary holding of the bankruptcy court and therefore does not address the alternate finding.[13]

### (1) Contract Interpretation

■ Confirmed bankruptcy plans of reorganization are binding contracts that must be interpreted in accordance with applicable contract law.[14] *See Official Creditors Comm. of Stratford of Tex., Inc. v. Stratford of Tex., Inc. (In re Stratford of Tex., Inc.)*, 635 F.2d 365, 368 (5th Cir.1981) (stating that the confirmed arrangement "is tantamount to a judgment" and "should be construed basically as a contract"); *see also Official Unsecured Creditors' Comm. of Erie Hilton Joint Venture v. Siskind (In re Erie Hilton Joint Venture)*, 137 B.R. 165, 171 (Bankr.W.D.Pa. 1992) (following similar approach). The parties have agreed that Pennsylvania law governs. (Agreement of Sale, § 21, LHTW Ex. 24 ("This agreement shall be governed and construed in accordance with the substantive laws of the Commonwealth of Pennsylvania and the Bankruptcy Code. . . .").)

13. Although this court does not analyze the extrinsic evidence, it notes that there is substantial support in favor of the bankruptcy court's decision.

14. The language in question is contained in the Agreement of Sale, which is one part of the Second Amended Plan of Reorganization (the "Plan"). The Agreement of Sale is not a freestanding contract, it is only valid as it relates to the Plan. The contract in question is, therefore, the Plan.

■ According to bankruptcy law, the confirmed plan or contract includes "all documents which were confirmed together to form the contract." *In re Erie Hilton,* 137 B.R. at 171. The Sugarhouse Realty confirmed plan or contract therefore includes the Plan, the Agreement of Sale, and the complete Second Amended Disclosure Statement ("Disclosure Statement"), including attachments.[15] (Confirmation Order at ¶ 3, First Lehigh Ex. 1 ("The Plan, the Asset Purchase Agreement, and all transactions, documents, instruments and agreements referenced to therein, contemplated thereunder or executed and delivered in connection therewith, are approved. . . .").) All portions of the contract must be construed together to determine the intent of the parties. *In re Erie Hilton,* 137 B.R. at 171 ("The Confirmed Plan must be read so as to include the provisions of all documents which were confirmed together to form the contract."); *Wrenfield Homeowners Ass'n, Inc. v. De-Young,* 410 Pa.Super. 621, 600 A.2d 960, 963 (1991) ("In construing a contract, 'each and every part of it must be taken into consideration and given effect, if possible, and the intention of the parties must be ascertained from the entire instrument.'") (quoting *Marcinak v. Southeastern Greene Sch. Dist.,* 375 Pa.Super. 486, 544 A.2d 1025, 1027 (1988)).

■ The paramount consideration of the court is to "ascertain and give effect to the contracting parties' objectively manifested intent." *Windsor Sec., Inc. v. Hartford Life Ins. Co.,* 986 F.2d 655, 667 (3d Cir.1993) (quoting *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980)). To ascertain intent, the court looks to the circumstances, the situation of the parties, the object they have in mind, and the nature of the subject matter of the contract. *Mellon Bank,* 619 F.2d at 1011 (citing *United Refining Co. v. Jenkins,* 410 Pa. 126, 189 A.2d 574, 580 (1963)).

■ The court first looks to the words chosen by the parties to the contract to determine whether the words are ambiguous. *Stendardo v. Federal Nat'l Mortgage Ass'n (In re Stendardo),* 991 F.2d 1089, 1094 (3d Cir.1993) ("The preliminary inquiry is to determine whether the terms at issue are ambiguous."). The court assumes that the parties chose the words that would best convey their intent. *Liazis v. Kosta, Inc.,* 421 Pa.Super. 502, 618 A.2d 450, 454 (1992) ("[T]he law assumes that the parties chose the language carefully.") (citations omitted), *appeal denied,* 536 Pa. 630, 637 A.2d 290 (1993).

■ Although all parties characterize the phrase "the latter of" as unambiguous, two different interpretations are offered.[16] This court must, therefore, determine whether the term is "susceptible to two reasonable

---

**15.** Even if the Disclosure Statement were not part of the contract, "[i]t is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties." *Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 107 (3d Cir.1986) (citing *Von Lange v. Morrison–Knudsen Co.,* 460 F.Supp. 643, 647–48 (M.D.Pa.1978), *aff'd,* 609 F.2d 504 (3d Cir.1979)) (other citations omitted). The Disclosure Statement, to which the Letter Agreement between LHTW and the EPA (the "Letter Agreement") is attached as an exhibit, was executed simultaneously with the Plan.

**16.** Before the bankruptcy court, each party offered dictionary definitions to support its version of the term's ordinary meaning. The EPA referred the court to the American Heritage Dictionary (2d College ed. 1982) which defines latter as:

(adj.) 1. Designating the second of two persons or things mentioned. 2. Further advanced in time or sequence; later. 3. Closer to the end; the latter part of the book.—n. The second of two persons or things mentioned.

LHTW relied on *Webster's Third New International Dictionary* (1986) and the *Oxford English Dictionary* (2d ed. 1993) to support its case, both of which it claims favor the "later in time" definition.

The bankruptcy court, in its decision, relied on *The Random House Dictionary of the English Language,* (College ed. 1968), which defines latter as:

1. being the second mentioned of two (distinguished from former). 2. more advanced in time; later. 3. near or comparatively near to the end: the latter part of the century. 4. Obs. last; final.

*In re Sugarhouse Realty,* 1995 WL 114151, at *9.

alternative interpretations," and thus, ambiguous. *In re Stendardo,* 991 F.2d at 1094 (citing *Mellon Bank,* 619 F.2d at 1011). Whether ambiguity exists is a question of law over which this court exercises plenary review. *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir.1981) (stating that matters of law are given plenary review); *Mellon Bank,* 619 F.2d at 1011 (finding that a court's determination that a contract term is clear or ambiguous is a matter of law) (citation omitted). If the court determines that the term is ambiguous, extrinsic evidence is admissible to assist the finder of fact. *See In re Estate of Herr,* 400 Pa. 90, 161 A.2d 32, 34 (1960). If the court finds that the term is unambiguous, it must look only to the document for interpretation and accord the term its plain meaning. *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 661 (1982) ("[W]hen the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.") (citation omitted).

According to Pennsylvania law, "[i]n determining whether a contract term is ambiguous, we must consider the actual words of the agreement themselves, as well as any alternative meanings offered by counsel, and extrinsic evidence offered in support of those alternative meanings." *St. Paul Fire & Marine Ins. Co. v. Lewis,* 935 F.2d 1428, 1431 (3d Cir.1991) (citing *International Union, UAW v. Mack Trucks, Inc.,* 917 F.2d 107 (3d Cir.1990)), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).[17] If no reasonable alternative meanings are presented, the writing will be enforced as the judge reads it on its face. *Northbrook Ins. Co. v. Kuljian Corp.,* 690 F.2d 368, 372 n. 5 (3d Cir.1982) (citation omitted).

LHTW argues that the term "the latter of" unambiguously means "later in time." (Brief of Appellant at 26.) It further claims that interpreting the term as such comports with

the intent of the parties to permit the buyer to withdraw from the Agreement of Sale any time prior to the occurrence of the later in time of the listed events, regardless of sequence. Thus, only after both (a) (execution) and (b) (confirmation) occurred would the buyer, LHTW, be bound. Because the execution and delivery of the Agreement of Sale had not occurred, LHTW argues it was not bound. LHTW maintains that because the signature was an important event to the contract, the parties intended that both execution and confirmation were necessary in order to bind the parties. (Brief of Appellant at 14.) It offered as evidence testimony that the clause was added for the purpose of "having somebody step up to the plate" and sign on the representations and warranties to bind the Debtors. *In re Sugarhouse Realty,* 1995 WL 114151, at *10 (citation omitted).

LHTW further contends that the bankruptcy court's interpretation renders clause (a) of section 3.3 meaningless, in violation of contract principles mandating that a contract provision may not be read to annul another section. (Brief of Appellant at 27) (citing *Cerceo v. DeMarco,* 391 Pa. 157, 137 A.2d 296, 298 (1958).) It argues that if the parties had intended to be bound upon confirmation they would have left clause (a) out of section 3.3 of the contract. Appellant urges that only by interpreting the term as "later in time" are both clauses of section 3.3 given effect. *Id.* at 28–29.

Appellees EPA and First Lehigh argue that the term is unambiguous and means "second of two things mentioned." (Brief of Appellee EPA at 5 n. 6; Brief of Appellee First Lehigh at 33, 38 & n. 35.) They maintain that, consistent with bankruptcy law and procedure, the intent of the parties was to allow only preconfirmation withdrawal and limited post-confirmation termination. Appellee First Lehigh characterizes clause (a) of section 3.3 as a counterpoint to clause (b),

---

17. Most courts, in general, and Pennsylvania courts, in particular, permit "examination of external signs and objective indicia" to aid in a "rational interpretation of the parties' intent." *Northbrook Ins. Co. v. Kuljian Corp.,* 690 F.2d 368, 372 n. 5 (3d Cir.1982) (quoting *Mellon Bank,* 619 F.2d at 1013 n. 13); *see also Steuart,* 444 A.2d at 661 ("[S]ome surrounding circumstances always must be known before the meaning of the words can be plain and clear; and proof of the circumstances may make a meaning plain and clear when in the absence of such proof some other meaning may also have seemed plain and clear.") (quoting 3 Corbin, Contracts § 542 (1960)).

claiming withdrawal rights would not end upon occurrence of (a) (execution of the Agreement of Sale), but only after (b) (confirmation). (Brief of Appellee First Lehigh at 39.) Thus, if the Agreement of Sale were signed, but the Plan was not confirmed, the buyer (LHTW) would not be bound. This is consistent with the Bankruptcy Code under which a party in reorganization cannot sell assets of the bankruptcy estate without the court's approval. *See* 11 U.S.C. §§ 541, 542.

The bankruptcy court agreed with the Appellees' definition and found that the parties drafted the Agreement of Sale conditioned on confirmation of the plan. *In re Sugarhouse Realty*, 1995 WL 114151, at *9. Contrary to LHTW's assertion, this reading does give effect to all provisions and is consistent with both the rest of the contract and normal bankruptcy procedure.

(2) The Contract as a Whole

▮ The Letter Agreement, dated March 18, 1994, is attached to the Disclosure Statement (EPA) as Exhibit 6. (Second Amended Disclosure Statement (EPA), LHTW Ex. 58.) The wording in the Letter Agreement, which is only slightly different from the wording in the Agreement of Sale, supports the Appellees' interpretation of section 3.3 of the Agreement of Sale. The Letter Agreement reads:

> LHTW may elect to withdraw this offer to enter into the LHTW Agreement and pursue its support of the Competing Plan at any time prior to the date of confirmation of the EPA's Competing Plan, without and [sic] liability or penalty to LHTW, whereupon this agreement shall be of no further effect. Moreover, the LHTW Agreement will provide that if the Conditions Precedent are not satisfied, or waived by Buyer, within a certain period of time specified therein, Buyer shall have certain limited rights, more fully set forth in the LHTW Agreement, to terminate the LHTW Agreement. . . .

(Second Amended Disclosure Statement (EPA), LHTW Ex. 58.) The Letter Agreement recognizes confirmation as the key

event and allows withdrawal only prior to confirmation. The intent expressed in this section of the Letter Agreement would be in conflict with the similarly worded clause in the Agreement of Sale, if the court were to accept LHTW's interpretation. Established rules of construction require the court to read provisions of a contract so as not to conflict with each other. *Kingston Dodge, Inc. v. Chrysler Corp.* 449 F.Supp. 52, 54 (M.D.Pa.1978) (citing *Keystone Fabric Laminates, Inc. v. Federal Ins. Co.*, 407 F.2d 1353 (3d Cir.1969)).

▮ Use of the term "withdraw" by the drafter, LHTW, in both documents is also significant. Appellees argue persuasively that presentation of a plan is akin to an offer.[18] In accordance with basic contract law, once an offer has been accepted and becomes a binding agreement the offer cannot be withdrawn, the agreement can only be terminated. *United States v. Lipman*, 122 F.Supp. 284, 287 (E.D.Pa.1954) (noting the ordinary common law rule that an offer may be withdrawn only prior to acceptance); *see also* 11 U.S.C. § 1141 (providing that confirmation renders agreements binding). The Letter Agreement clearly contemplates withdrawal only prior to confirmation and a limited right of termination thereafter. (Letter Agreement, LHTW Ex. 58.) LHTW's interpretation of the Agreement of Sale would permit an offer to be withdrawn after contract formation, in conflict with basic contract law.

The EPA points out that the word "latter" is used as a noun in the Agreement of Sale. Both dictionaries relied upon by LHTW which list the definition "later in time" as the preferred definition do so as an adjective. The bankruptcy court also noted that within the Plan, LHTW, the drafter of the documents, uses the term "later" when it intends to convey the meaning "later in time." *In re Sugarhouse Realty*, 1995 WL 114151, at *9. In a phrase similar in construction to the one in question, the Plan at page 5 reads, "Effective Date means the first Business Day after the later of (i) . . . and (ii). . . ." (Second

---

18. The EPA cites *Unarco Indus., Inc. v. Bloomington Factory Workers (In re UNR)*, 173 B.R. 149, 156–57 (Bankr.N.D.Ill.1994), which states that "a plan is a kind of contract involving, as it does, matters of offer, acceptance, performance and the like."

Amended Plan of Reorganization, LHTW Ex. 58.) The use of two different words in a similar construction suggests that the drafter intended different meanings.

Another section of the Agreement of Sale that conflicts with LHTW's argued interpretation is section 13.2.4(c), which reads as follows:

> If this Agreement has not been terminated as set forth in this section 13.2.4, then Buyer's obligation to consummate Closing shall remain unaffected and in full force and effect.

(Agreement of Sale, LHTW Ex. 24.) According to the Agreement of Sale, the only means of ending the contract, with the exception of section 10 relating to quality of title, is termination pursuant to section 13.2.4, entitled "Conditions Precedent." There is no discussion of withdrawal in section 13.2.4, only termination. Appellees argue that the reason for this is that both the Letter Agreement and the Agreement of Sale permit limited post-confirmation termination, but neither permit withdrawal post-confirmation. *See In re Sugarhouse Realty,* 1995 WL 114151, at \*13.

The Disclosure Statement drafted by LHTW was filed contemporaneously with the Plan. The disclosure statement is distributed to all creditors and must include information in sufficient detail to enable creditors to make an informed judgment before voting on a plan. 11 U.S.C. § 1125; *see also Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight),* 848 F.2d 414, 417 (3d Cir.1988) ("The importance of full disclosure is underlaid by the reliance placed upon disclosure statements by the creditors and the court."), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988).[19] There is no indication in the Disclosure Statement that the parties considered the Plan subject to withdrawal post-confirmation if signature of the Debtors was not obtained. This unusual contingency

would be a pertinent fact necessary for the creditors to make an "informed judgment." If proceeding was contingent upon signature, and LHTW could withdraw post-confirmation, delay was probable, if not inevitable, and the success of the Plan would be uncertain. This would no doubt have affected the creditors' vote. It would also have affected the court's approval of the Plan. The Bankruptcy Code requires the court to approve plans only if they offer a reasonable prospect of success and are workable. *See* 11 U.S.C. § 1129(a)(11); *In re Haardt,* 65 B.R. 697, 701 (Bankr.E.D.Pa.1986) ("In essence, § 1129(a)(11) requires that the Court determine the feasibility of the plan, i.e., whether it offers a reasonable prospect of success and is workable.") (citation omitted).[20] Thayer's strong resistance would have rendered the plan unworkable if LHTW had a post-confirmation right of withdrawal.

The Disclosure Statement also undermines LHTW's argument that it considered the signature important because it "wanted someone to step up to the plate and sign on the representations." *In re Sugarhouse Realty,* 1995 WL 114151, at \*10 (citation omitted). Page three of the Disclosure Statement reads:

> NO ASSURANCE CAN BE GIVEN AS TO THE ACCURACY OF THE INFORMATION PROVIDED BY THE DEBTOR AND NO REPRESENTATION IS MADE BY THE PLAN PROPONENT AS TO ANY INFORMATION PROVIDED HEREIN, EXCEPT AS EXPRESSLY IDENTIFIED AS HAVING BEEN DETERMINED BY THE PLAN PROPONENT.

(Second Amended Disclosure Statement (EPA), LHTW Ex. 58.) Further, pages 11 and 12 read:

> The Plan Proponent has not independently verified the Debtors' environmental analyses and makes no representations respect-

---

**19.** The court recognizes that LHTW is not the plan proponent. However, it also recognizes that LHTW collected all information and drafted the documents.

**20.** What constitutes adequate information required to be included in the disclosure statement

under the Bankruptcy Code is to be determined by the facts and circumstances of each case. H.R.Rep. No. 595, 95th Cong., 2d Sess. 409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6365.

ing the state of environmental compliance at the Site.

(Second Amended Disclosure Statement (EPA), LHTW Ex. 58.) These provisions reveal that it was abundantly clear not only that the Debtors might not sign, but also that the EPA never intended to warrant and represent the Site's condition in any manner.

Because the parties were fairly confident that Thayer would not sign the Agreement of Sale, the documents were carefully drafted by LHTW to bind the Debtors and allow the parties to proceed notwithstanding Thayer's lack of cooperation and lack of signature. *In re Sugarhouse Realty,* 1995 WL 114151, at \*9. While the court appointed the EPA the attorney-in-fact with the power to execute documents on behalf of Sugarhouse Realty, it did not require the EPA to do so. (Second Amended Plan at Article V, section 5.3, LHTW Ex. 58). Thus, the parties knew and anticipated the possibility that no one would sign the Agreement of Sale on behalf of Sugarhouse Realty. LHTW's argument that the parties did not intend to be bound without a signature is not persuasive.

### (3) Bankruptcy Law and Procedure

The Plan and detailed order confirming the Plan (the "Confirmation Order") provided for the lack of cooperation and eliminated the need for the signature. The Plan does not merely set forth the details of the reorganization but specifically references and incorporates the Agreement of Sale and states, in Article V:

> 5.3 The Debtor *shall* timely execute the Asset Purchase Agreement and such other documents as may be necessary or appropriate to effectuate the terms of the Asset Purchase Agreement and the Plan. The Plan Proponent is hereby appointed attorney-in-fact for the Debtor for the purpose of, and is authorized to, execute the Asset Purchase Agreement and any and all documents, including deeds and/or bills of sale necessary to consummate the Asset Purchase Agreement and the Plan.

(Second Amended Plan of Reorganization (EPA), Article V, section 5.3, LHTW Ex. 58 (emphasis added).) Upon confirmation of the Plan, the bankruptcy court signed the Confirmation Order which supersedes the Plan. Pursuant to 11 U.S.C. § 1141, the confirmation order binds all parties to perform the substantive provisions of the plan.[21] *Reisher v. Internal Revenue Serv. (In re Reisher),* 149 B.R. 372, 374 (Bankr.M.D.Pa.1992) (stating that when language in the plan and the confirmation order conflict, the language of the confirmation order prevails). Even if the court were to find that the Plan allowed for post-confirmation withdrawal, the controlling language of the Confirmation Order clearly does not.

The Confirmation Order contains the following very specific language directing the parties to consummate the transaction:

> 3. The Plan, the Asset Purchase Agreement and all transactions, documents, instruments and agreements referenced to therein, contemplated thereunder or executed and delivered in connection therewith, are approved and the Debtor, the Disbursing Agent and other parties thereto are authorized and *directed* to enter into and *perform* according to their terms.

> 4. Pursuant to Section 1142(a) of the Bankruptcy Code, notwithstanding any otherwise applicable non-bankruptcy law . . . relating to financial condition, the Debtor, the Plan Proponent and the disbursing Agent shall carry out the Plan and the related transactions.

> . . . .

> 7. [P]rovisions of the Plan are valid and enforceable and bind the Debtor . . .

> . . . .

> 9. The Debtor is authorized and directed to sell its real property and other assets as set forth in the Plan and the Asset Purchase Agreement . . . on the terms and conditions set forth therein. . . .

---

21. 11 U.S.C. § 1141 reads, in pertinent part, as follows:

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor. . . .

(Order Confirming Second Amended Plan of Reorganization Filed by the United States on Behalf of the EPA ("Confirmation Order"), First Lehigh Ex. 1 (emphasis added).) The bankruptcy court also noted that LHTW's alleged fear that the Debtors would not be bound without a signature was groundless given the nature of the proceeding. The Debtors who initiated the Chapter 11 proceedings are bound under the Bankruptcy Code with or without a signature. As the bankruptcy court stated, "as of the entry of the confirmation orders, the Debtors no longer needed to 'advance to the plate'; they had been forcibly brought to, and were already at, the plate." *In re Sugarhouse Realty,* 1995 WL 114151, at *11.

There is no question that, if as LHTW contends, a signature was important, the bankruptcy court had the power under the Bankruptcy Code to compel Thayer to sign the agreement if necessary. Section 1142 of the Bankruptcy Code grants the court broad jurisdiction to secure implementation of the plan and to enter orders to effectuate the plan.[22] *See United States v. Unger,* 949 F.2d 231, 234 (8th Cir.1991) ("If the court retains jurisdiction to ensure that the parties fulfill the intent and specific provisions of the plan, then it must buttress this jurisdiction with the ability to have coercive measures applied....."). It is also clear that LHTW knew of the court's power to compel and could have asked the court to compel Debtor to execute the document. *See In re Sugarhouse Realty,* 1995 WL 114151, at *14 (LHTW requested First Lehigh's counsel to

file such a motion and then withdrew the request).

Permitting withdrawal after confirmation would be in conflict not only with this specific plan of reorganization, but with the Bankruptcy Code generally. While LHTW characterizes this case as a contract dispute, (Reply Brief of Appellant at 4), this court finds more importantly that it is a contract dispute within the context of a Chapter 11 bankruptcy reorganization. Without the bankruptcy proceeding there would be no Agreement of Sale. The Agreement of Sale alone is invalid; it is valid only as part of a confirmed plan of reorganization.

The purpose of bankruptcy law is twofold: to achieve a just and equitable distribution of assets to creditors and to relieve the debtor of the weight of indebtedness. *In re Campbell,* 124 B.R. 462, 464 (Bankr. W.D.Pa.1991) (citing *In re Epstein,* 39 B.R. 938, 941 (Bankr.D.N.M.1984)).[23] This court finds implausible the implication that the bankruptcy court would proceed with confirmation only to allow a party to withdraw at a later date. Confirmation is the pivotal event in a reorganization proceeding. *See Baldwin Technology Corp. v. Dahlgren Int'l Inc. (In re Dahlgren Int'l, Inc.),* 147 B.R. 393, 404 (Bankr.N.D.Tex.1992) ("The act of confirmation is, perhaps, the major event in a Chapter 11 proceeding."). Upon entry of an order of confirmation, the plan and the order fix the rights of the parties and become binding. *Occidental Petroleum Corp. v. Walker,* 289 F.2d 1, 5 (10th Cir.1961) (citing *Prudence Realization Corp. v. Ferris,* 323 U.S. 650, 65 S.Ct. 539, 89 L.Ed. 528 (1945)).[24]

---

**22.** 11 U.S.C. § 1142(a) reads:

Notwithstanding any otherwise applicable non-bankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court.

11 U.S.C. § 1142(b) reads:

The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

**23.** In the instant case, the EPA and the City of Philadelphia had concerns about both environmental remediation and monetary recovery.

**24.** Courts have consistently emphasized the importance of finality in bankruptcy proceedings. *See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.),* 848 F.2d 414, 417 (3d Cir.1988) ("A strong interest to achieve finality pervades Chapter 11 arrangements.") (citation omitted), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988); *Christopher v. American Universal Ins. Group, Inc. (In re Christopher),* 148 B.R. 832, 837 (Bankr.N.D.Tex.1992) ("A strong policy favors enforcement of the plan of reorganization because ... too many interests have relied on the finality of the confirmation order.... Once the

LHTW's proposed interpretation would lead to an irrational result. The confirmation process is lengthy and expensive. It is unreasonable to believe the parties involved would expend the time, effort, and funds on such an illusory plan. The attraction of the LHTW-authored plan was that it offered the creditors more money up front and provided for fewer contingencies. The court finds it unlikely that creditors owed a substantial amount of money for a long time would vote for an indefinite plan that could be withdrawn post-confirmation. It is even less likely they would invest unrecoverable money to sponsor such a plan.

Upon consideration of the entire contract and its context, it is clear that the term "the latter of" reasonably permits only one meaning which will effectuate the parties' intent— "the second of two things mentioned." Therefore, this court confirms the bankruptcy court's holding in this regard and finds LHTW had no post-confirmation right of withdrawal pursuant to section 3.3 of the Agreement of Sale.[25]

**B. Failure to Close/Right of Termination**

██ The second argument raised by Appellant LHTW on appeal is that the Bankruptcy Court erred in holding that LHTW had no right to refuse to close under the Agreement of Sale. Specifically, LHTW finds error in the court's interpretation of sections 7.1, 7.1.7, 9.1, 13.2, and 13.2.1 of the Agreement of Sale. The bankruptcy court found the phrases unambiguous and interpreted them as warranties of knowledge, not quantity or condition. The sections in question read as follows:

7. *Representations.*

7.1 Seller hereby makes the following representations and warranties to Buyer which are true and correct as of the date hereof and will be true and correct on the Closing Date as if then made:

. . . .

7.1.7 Seller has not received notice of any violation of any environmental law or regulations, and Seller is *aware* of no violation of any environmental laws or regulations, except as set forth on Exhibit D attached hereto and made part hereof. . . .[26]

. . . .

9. *Environmental.*

9.1 Seller represents and warrants to Buyer as being true and correct as of the date hereof and on the Closing Date as if then made, that it is *unaware* of the *existence* of any hazardous materials or storage tanks in, on, under, about or affecting the Property except as set forth in environmental reports and studies obtained by Sellers and listed on Exhibit E attached hereto and made part hereof. . . .[27]

plan is confirmed, the property rights of many of these interests are adjusted thereby creating a new status which is important to preserve."), aff'd, 28 F.3d 512 (5th Cir.1994); *Winston Inn & Restaurant Corp. v. DeMichiel (In re Winston Inn & Restaurant Corp.)*, 120 B.R. 631, 637 (Bankr. E.D.N.Y.1990) ("To allow purchasers to bid hundreds of thousands of dollars before a court, to have lienholders agree . . . and then to have the purchaser renege upon further inquiry into the nature of the property, would interject an intolerable element of uncertainty and inequity. . . . Moreover, it could deprive the debtor and the lienholders of the benefit of an offer made by a more serious bidder.") (referring to a judicial sale).

25. This court finds no ambiguity. However, it does recognize the rule that, in order to prevent draftsmen from gaining an advantage by using deliberately obscure language, any ambiguities would be construed against the drafter. Restatement (Second) of Contracts § 206 (1981); *see also In re F.H. McGraw & Co.*, 473 F.2d 465, 468 (3d Cir.) ("Any ambiguity resulting from this deliberate choice of language will be interpreted

most strongly against the party who wrote it. . . .") (citations omitted), *cert. denied*, 414 U.S. 1022, 94 S.Ct. 443, 38 L.Ed.2d 312 (1973). Here, LHTW was the drafter.

26. Exhibit D contains the Court of Common Pleas of Philadelphia County's order requiring remediation of asbestos.

27. Exhibit E contains the reports prepared by the Brandywine Environmental Group, Inc. (the "Brandywine Reports") entitled Phase I, Phase II, and Phase III. Phase I was performed to "address potential areas of environmental concern." (Brandywine Reports, Phase I, LHTW Ex. 18A, Tab 6.) Phase II was performed to identify "location and description of potential sources of contamination, the need for remediation, the type of remediation, and/or the extent of previous contamination." (*Brandywine Reports*, Phase II, LHTW Ex. 18A, Tab 6.) Phase III was performed to set "a temporary schedule . . . to begin the implementation of remediation. . . ." (Brandywine Reports, Phase III, LHTW Ex. 18A, Tab 6.)

. . . .

13. *Conditions Precedent.*

. . . .

13.2 Buyer's obligation to close the transaction contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions precedent, any or all of which Buyer may, at its sole discretion, elect to waive by providing written notice thereof to Seller:

13.2.1 All of the representations contained in this agreement shall have been true and correct *in all material respects* when made and shall be true and correct in all material respects on and as of the Closing Date.

(Agreement of Sale, LHTW Ex. 24 (emphasis added).)

The conditions LHTW alleges violate the above are:

(1) quantities of asbestos three times as great as represented by the debtors, with a remediation cost of at least ten times as much as that disclosed by the debtors;

(2) United States Army Corps of Engineers written notices of violations of wetlands areas due to unlawful fill that must be excavated and then restored;

(3) substantial illegal groundwater and soil contamination relating to releases of petrocarbons from underground gas and oil tanks including total petroleum hydrocarbon contamination 9 to 97 times higher than applicable standards, and carcinogenic benzene contamination 30 times higher than applicable standards . . .;

(4) illegal concentrations of PCBs in and around the transformer room concrete mat 30 times higher than applicable standards; and

(5) illegal contamination of river sediment with PCBs and certain metals, in some cases several hundred times higher than applicable standards.

(Brief of Appellant at 36.)

#### (1) Interpretation

The crux of this argument is again contract interpretation. The paramount consideration of the court is to "ascertain and give effect to the contracting parties' manifested intent." *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 667 (3d Cir.1993) (citing *Mellon Bank*, 619 F.2d at 1009). LHTW argues that the intent of the parties was to permit post-confirmation due diligence inspection and termination of the contract if the environmental conditions at Closing were worse than those represented in the Agreement of Sale. (Brief of Appellant at 40.) The Appellees, on the other hand, argue that the intent of the parties was to permit only pre-confirmation due diligence investigations. (*See, e.g.,* Brief of Appellee First Lehigh at 48.) Appellees further urge that because all parties knew that the property was a "Pandora's Box" of environmental problems the risks of which LHTW readily and willingly agreed to assume, the parties could not and would not warrant the condition of the property. (*See, e.g.,* Brief of Appellee First Lehigh at 49.) In support of this argument, Appellees point to the provisions in the Plan and the context of the agreement.

The contract unambiguously requires the representations to be true when made and at closing. (*See* Agreement of Sale, §§ 7.1, 9.1, & 13.2.1., LHTW Ex. 24.); *see also In re Sugarhouse Realty*, 1995 WL 114151, at *17. There has been no proof that the Sellers' representations were not true when made. The questions to be resolved are what was warranted, whether due diligence was permitted post-confirmation, and whether the warranties have been breached. If there are any breaches, the court must then determine whether they are material and whether a failure of conditions precedent has occurred, thus permitting termination by LHTW. This court finds that the terms do not permit the interpretation urged by LHTW.

LHTW argues that the clauses are unambiguous warranties of specific condition or quantity. (*See* Brief of Appellant at 40.) If this were so, the language in section 7.1.7, which reads, "except as set forth in Exhibit D," and in section 9.1, which reads, "except as set forth in . . . the Environmental Reports," would demonstrate that the parties intended to warrant that the actual amounts of hazardous waste present at the Site were listed in the reports attached to the Agree-

ment of Sale. A look at the documents themselves renders this argument untenable.

The bankruptcy court found that the clauses are warranties of knowledge intended to prevent withholding of material information possessed by the unwilling Sellers (Debtors). *See In re Sugarhouse Realty,* 1995 WL 114151, at *18 (stating that the sections were to "ensure that the Seller has been forthright and candid with the Buyer, and has fully and completely disclosed to the Buyer any information which the Seller has relative to the matters at issue in the subject paragraphs of the Agreement of Sale.")[28] As such, they obligate the Sellers (Debtors) to disclose to Buyer (LHTW) any new information obtained before closing that is material and varies from that already disclosed.[29] Production of additional information by LHTW does not amount to withholding of information by the Debtors.

■ Caveat emptor is the rule in Pennsylvania regarding sales of industrial property between corporations of roughly equal resources, as is the case here. *Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 313 (3d Cir.) ("[W]here, as here, corporations of roughly equal resources contract for the sale of an industrial property, and especially where the dispute is over a condition on the land rather than a structure, *caveat emptor* remains the rule.") (footnote omitted), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); *see also id.* at 312 (" '[I]n the absence of fraud or misrepresentation a vendor is responsible for the quality of property being sold by him only to the extent for which he expressly agrees to be responsible....' ") (quoting *Elderkin v. Gaster,* 447 Pa. 118, 288 A.2d 771, 774–75 (1972)).

■ Section 2.6 of the Agreement of Sale reads, "Realty and improvements thereon are being purchased in 'AS IS' condition." An "as is" clause disclaims implied warran-

ties. *PBS Coals, Inc. v. Burnham Coal Co.,* 384 Pa.Super. 323, 558 A.2d 562, 564 ("The warranties which may otherwise be implied by law do not attach when the buyer agrees to accept the goods in the condition in which they are found."), *appeal denied,* 524 Pa. 598, 568 A.2d 1248 (1989). Therefore, LHTW may avail itself only of the warranties expressly granted in the contract. Not only does an "as is" clause disclaim implied warranties, it also gives notice that the property may have defects. *See id.* (An 'as is' clause puts the buyer "on notice that there may be liabilities attendant to the purchase."). It is unlikely that a contract which disclaims implied warranties would then provide broad express warranties on the same property. Therefore, "the presence of the 'AS IS' clause weighs in favor of narrowly construing the express warranties in the Agreement of Sale." *In re Sugarhouse Realty,* 1995 WL 114151, at *25.

The Second Amended Disclosure Statement (EPA) further supports this narrow reading. Page three contains the following express disclaimer:

EXCEPT WHERE SPECIFICALLY NOTED, THE INFORMATION CONCERNING THE DEBTOR AND ITS ASSETS AND LIABILITIES IS BASED UPON INFORMATION OBTAINED FROM THE AMENDED DISCLOSURE STATEMENTS FILED BY THE DEBTOR, THE DISCLOSURE STATEMENT RELATING TO PLAN REORGANIZATION PROPOSED BY THE CITY OF PHILADELPHIA ("PHILADELPHIA DISCLOSURE STATEMENT"), WHICH HAS BEEN WITHDRAWN, THE SCHEDULES AND STATEMENT OF AFFAIRS FILED BY THE DEBTOR, AND OTHER PUBLIC DOCUMENTS. NO ASSURANCE CAN BE GIVEN AS TO THE ACCURACY OF THE INFORMATION PROVIDED BY THE DEBTOR AND NO REPRESENTATION IS

---

**28.** Gowa, counsel for LHTW, acknowledged at the hearing before the bankruptcy court that the warranties contained in section 9 of the Agreement of Sale are warranties of the state of mind of the seller. (NT 11/10/94 at 108, 114–15, 123.)

**29.** For an example of a clear warranty of condition, see *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563, 1568 (E.D.Pa.1988) ("Seller and Union jointly and severally represent and warrant to Buyer that ... the land included in the Leased Premises was free of contamination in violation of any ... law....").

MADE BY THE PLAN PROPONENT AS TO ANY INFORMATION PROVIDED HEREIN, EXCEPT AS EXPRESSLY IDENTIFIED AS HAVING BEEN DETERMINED BY THE PLAN PROPONENT.

Similarly, pages 11 and 12 read:

The Debtor is under Court Order to provide remediation for the asbestos and tank removal. The Debtor has estimated that this remediation will cost approximately four hundred thousand dollars ($400,000.00). The Plan Proponent has not independently verified the Debtor's environmental analyses and makes no representations respecting the state of environmental compliance at the Site.

(Second Amended Disclosure Statement (EPA) at 3, 11–12, LHTW Exhibit 58.) The information contained in the Disclosure Statement was gathered from outside documents, as were the warranties LHTW included when it drafted the Agreement of Sale. This court cannot find that parties who included the above disclaimers intended to warrant quantity or cost. Nor does it believe the EPA would be willing to sponsor a plan contingent on the veracity of the Debtors' representations which were not made to the EPA or LHTW by the Debtors, nor checked for accuracy by either, but rather were gathered from outside documents by LHTW and incorporated into the Plan.

This court again finds the context of the agreement to be of critical importance. This was not a sale of real estate between a willing seller and buyer. It was not a case of a seller fraudulently misrepresenting the condition of the property to induce purchasers. Rather, it was a forced sale of real property owned by a recalcitrant Chapter 11 debtor. The buyer in this case was not an unwitting third party, but a sophisticated entity, advised by knowledgeable counsel, that vigorously pursued purchase. LHTW was well aware that Thayer's documents were incomplete and contained errors. It was wary of information obtained from Thayer. LHTW now argues that because the results of testing it performed post-confirmation show quantities of hazardous waste in excess of those approximated in reports attached to the Agreement of Sale, it can withdraw from the confirmed plan on the grounds of misrepresentation or breach of warranty. Merely to state this proposition mandates its rejection.

### (2) Due Diligence

The bankruptcy court found that the parties intended that all due diligence investigations were to have been completed prior to confirmation. *In re Sugarhouse Realty*, 1995 WL 114151, at *19. LHTW claims that due diligence investigations were to be performed in the time between confirmation and closing, thus allowing it that window of time to inspect the land and possibly reject it. (Brief of Appellant at 40.) LHTW claims that the provisions in section 5.1 of the Agreement of Sale were added specifically for that purpose.[30] The language in section 5.1, however, was taken from the Agreement of Sale between Trump and Sugarhouse Realty. (*See* Agreement of Sale, §§ 5.1, 9.1, 13.2, LHTW Ex. 24; Agreement of Sale between Trump and Sugarhouse Realty, §§ 5.1, 9.1, 14.2.1, LHTW Ex. 21.) Trump had no need to perform due diligence investigations as he capped his liability at $325,000, which is less than the remediation cost of asbestos alone. (*See* Agreement of Sale Between Trump and Sugarhouse Realty, § 9.2, LHTW Ex. 21.) Therefore, the purpose of this clause could not have been to provide for post-confirmation due diligence investigations as LHTW maintains. The owner of the property was under court order to begin asbestos remediation prior to May 14, 1994. (Agreement of Sale Ex. D (Court of Common Pleas Judgment), LHTW Ex. 24). Section 5.1 of the Agreement of Sale, when read in conjunction with section 9.2,[31] was more likely to guaran-

---

**30.** Section 5.1 of the Agreement of Sale reads:

Buyer and its agents, consultants and representatives shall have the right to enter upon the Realty from time to time for the purpose of inspection of the property and to conduct such tests as Buyer may desire including, without limitation, air, water and soil samples, test borings, surveys, etc. . . . .

(Agreement of Sale § 5.1, LHTW Ex. 24.)

**31.** Section 9.2 of the Agreement of Sale reads as follows:

tee access to begin preparation for asbestos remediation.

The documents make it clear that the parties did not intend to provide for post-confirmation due diligence. Closing was to follow shortly after confirmation.[32] There was no window of time for due diligence. The bankruptcy court found that closing was conditioned on confirmation.[33] There are no references to post-confirmation due diligence investigations in any of the Plan documents. The court found as a factual issue that LHTW planned to perform due diligence investigations before confirmation, as is the norm. *In re Sugarhouse Realty,* 1995 WL 114151, at *19.

This court finds no provisions in the documentation to the contrary. A sophisticated buyer knowledgeable in real estate matters who intended to include a non-standard procedure could have and should have made the terms clear in the defining plan documents. LHTW not only claims the parties planned post-confirmation due diligence investigations, but also claims it was prevented from performing any meaningful pre-confirmation due diligence. (Brief of Appellant at 40.) The evidence shows that LHTW had performed its investigations. If LHTW had not completed its investigations, it could have and should have asked the EPA to request an extension, so it could perform due diligence investigations and decide, prior to confirmation, whether it wanted to purchase the property. There is no evidence that LHTW ever mentioned this "lack of investigation" to either of the plan proponents or the bankruptcy court. To the contrary, the facts also

show that investigation was to be done prior to confirmation and was completed to LHTW's satisfaction.

At the January 11, 1994 meeting attended by Debtors' representatives, LHTW representative Everett, and attorneys for both sides, LHTW requested the opportunity to perform due diligence investigations. (NT 9/26/94 at 84–86, 143–44.) LHTW subsequently hired surveyors, a title company, and TSD Environmental Services ("TSD"), an environmental consulting firm. *Id.* at 89–90. Everett and TSD visited the Site in January 1994, months before confirmation. *Id.* at 93. TSD performed an approximately seven-hour walk-through Phase I analysis of the Site for LHTW and noted possible PCB contamination, obvious asbestos contamination, and the presence of underground storage tanks. At that time, TSD recommended a reassessment of the Site. (Letter from TSD to Jan Quimby Fox of 1/18/94, LHTW Ex. 2.) The actions taken by LHTW pre-confirmation were consistent with due diligence investigations. LHTW claims it was prevented from performing due diligence investigations because of the weather and the lack of cooperation by Thayer. To the contrary, the evidence establishes that even after the City filed its plan and LHTW became a party, it did not attempt further due diligence. (NT 9/27/94 at 32.) Nor did LHTW seek access after Trump withdrew before confirmation. Nor did it attempt further due diligence when the EPA and First Lehigh became plan proponents. LHTW did not ask First Lehigh or the EPA to seek postponement of the confir-

---

Seller has advised Buyer of the entry of a judgment entered in the Court of Common Pleas of Philadelphia County ("the Judgment") ordering the removal of asbestos from the Property.... Buyer agrees to remove the asbestos pursuant to the Judgment or as soon thereafter as is reasonable.

(Agreement of Sale § 9.2, LHTW Ex. 24.)

**32.** Section 4 of the Agreement of Sale reads as follows:

Closing of title ... shall occur on a date ("Closing Date") set by the Buyer which shall be within ten (10) business days after satisfaction (or waiver thereof by Buyer in writing) of the Conditions Precedent (hereinafter defined). Section 13.2.4 lists the only acts that must be completed. It reads:

All necessary approvals incorporating the transactions contemplated by this Agreement as part of the plan of Bankruptcy Reorganization have been approved and confirmed by the Court and all applicable appeal periods have expired without the filing of an appeal or if a timely appeal was filed, the appeal or appeals have been denied and the Court's order confirming the Plan has been affirmed, and all further appeal periods have been expired....

(Agreement of Sale §§ 4, 13.2.4, LHTW Ex. 24.)

**33.** The Agreement of Sale provides that if the bankruptcy court's decision was not appealed, the parties contemplated closing the agreement of sale as early as within ten days of the entry of the order. Further, it was not certain that there would be an appeal.

mation hearing so that further due diligence investigations could be performed.

At the confirmation hearing, Everett testified, "[w]e found that those materials [supplied by Thayer] were completely inadequate and had to go and get our own title reports, hire our own environmental people, our own surveyor, because ... the debtor just didn't have ... what would normally be produced in a due diligence." (NT Confirmation Hearing 4/28/94 at 101.) Everett never stated that the due diligence investigation was continuing or incomplete. This court must conclude therefore that due diligence was to be performed prior to confirmation as is customary.

### (3) Breach of Warranty

LHTW claims that because certain express warranties have been breached, failures of conditions precedent have occurred. This court first looks to the warranties in sections 7.1, 7.1.7, and 9.1 to determine whether a breach has occurred.

■■■ The law with respect to breach of express warranties is set forth in *Fallowfield Dev. Corp. v. Strunk*, Nos. 89–8644, 90–4431, 1991 WL 17793, 1991 U.S.Dist. LEXIS 1699 (Bankr.E.D.Pa., Feb. 8, 1991), which states, "[u]nder Pennsylvania law, allegations of breach of express warranty require the plaintiff to prove that a specific misrepresentation was made which was material to the contract." *Id.* 1991 WL 17793 at *11 (citing *First Fed. Sav. & Loan Ass'n v. Reggie*, 376 Pa.Super. 346, 546 A.2d 62 (1988)). A misrepresentation is "an assertion that is not in accord with the facts." Restatement (Second) of Contracts § 159 (1981). To be actionable, the misrepresentation must be fraudulent or material. *See Silverman v. Bell Sav. & Loan Ass'n*, 367 Pa.Super. 464, 533 A.2d 110, 113 (1987) (stating that innocent misrepresentations are actionable if they relate "to a matter material to the transaction"), *appeal denied*, 518 Pa. 642, 542 A.2d 1371 (1988); Restatement (Second) of Contracts § 164 cmt. a (1981). LHTW has neither argued nor proven fraud; therefore, any misrepresentation made in this case would have to be material to support rescission. A material misrepresentation is a statement " 'of such a character that if it had

not been made, the transaction would not have been entered into.' " *Silverman*, 533 A.2d at 113 (citation omitted). The misrepresentation, however, must be justifiably relied upon by the recipient. *Miller v. Bare*, 457 F.Supp. 1359, 1361 (W.D.Pa.1978) ("It is now well established in Pennsylvania that an innocent misrepresentation of a material fact by a vendor that is *justifiably relied* on by a purchaser is a basis for rescission of a contract for sale of land." (emphasis added)); Restatement (Second) of Contracts § 164 cmt. d (1981) ("A misrepresentation, even if relied upon, has no legal effect unless the recipient's reliance on it is justified."). The record is replete with LHTW's references to Thayer's lack of trustworthiness and credibility. *See, e.g., In re Sugarhouse Realty*, 1995 WL 114151, at *18, *23; (NT 9/27/94 at 20–23; NT 9/26/94 at 137–40.)

The record also shows that LHTW's environmental consultant, TSD, informed it prior to confirmation that the Brandywine Reports might not be accurate or complete. *See In re Sugarhouse Realty*, 1995 WL 114151 at *23; *Id.* at *26 (finding that TSD warned LHTW after its January 1994 walk-through inspection that given the age of the refinery "there are bound to be some problems lurking beneath the Site."); LHTW Ex. 2 (showing that as early as January 18, 1994, TSD advised LHTW that environmental abatement costs were at least $1,000,000); (NT 9/31/94 at 85–86 (stating that TSD told LHTW's counsel three months prior to confirmation that the entire Site could be contaminated with PCBs).)

There is also no question that Thayer was uncooperative and did not want the property sold to LHTW. LHTW claims its reliance was nonetheless justified because the statements were made to a sophisticated businessman (Donald Trump). (NT 9/27/94 at 20–21.) However, as LHTW well knew, Trump would not be unduly harmed by any misrepresentations because his contract expressly limited his financial responsibility for environmental liability. (*See* Agreement of Sale Between Trump and Sugarhouse Realty, § 9.2, LHTW Ex. 21.) LHTW knew of numerous inaccuracies in the plan and Disclosure Statement prepared in conjunction with the Debtors'

agreement with Trump. *In re Sugarhouse Realty*, 1995 WL 114151, at *23. Nonetheless, LHTW claims it was justified in its reliance upon facts stated therein about which Thayer had little knowledge. *Id.*

Given the facts and context, this court, like the bankruptcy court, cannot find that LHTW justifiably relied upon any representations of the Debtor. In light of the reports reaffirming the contamination present at the Site presented to LHTW by TSD prior to confirmation, this court must also reject LHTW's contentions that it was surprised by the amount of contamination at the Site and that the representations were material.

This court will now address separately each of the conditions LHTW alleges breach the warranties contained in the Agreement of Sale.

(a) Asbestos

██ LHTW claims that a warranty is breached by the discovery of quantities of asbestos "three times as great as represented" and ten times as costly to remediate. (Brief of Appellant at 36.) LHTW states "quantitative differences between what is warranted and what is true can give rise to a material breach of contract" and cites cases in support thereof. (Brief of Appellant at 38.) This court accepts Appellant's statement of law, but finds it inapplicable because no implied or express warranties of quantity of any hazardous waste are present in the contract documents. A quantity of asbestos greater than Appellant believed existed does not amount to a breach of warranty.

LHTW was informed of and had evidence of the existence of large quantities of asbestos at the Site. The auction package relating to the Site, which was obtained by the LHTW prior to any negotiations, identifies large quantities of asbestos present at the Site. (*See* Brandywine Reports, Phase II, Auction Package, LHTW Ex. 18A, Tab 6.) The Brandywine Reports, contained in the Auction Package and attached to the Agreement of Sale, identify pervasive asbestos contamination throughout the Site and note loose asbestos on the floor in debris. (Brandywine Reports, Phase I, LHTW 18A, Tab 6.)

There could be no basis for relying on or warranting any figures presented in the reports; the reports themselves clearly disclaim the figures. The Brandywine Reports state that more analysis is needed and all quantities are approximate. (*See* Brandywine Reports, Phase II Conclusions and Recommendations, LHTW Ex. 18A, Tab 6.) The Reports, written in 1992, caution that future changes to the property may affect the validity of the analysis. (Brandywine Reports, LHTW Ex. 18A, Tab 6.) The reports also contemplate the discovery of further contamination. (*See* Brandywine Reports, Phase III, Preliminary Schedule, LHTW Ex. 18A, Tab 6) (stating that "[a]ny additional materials discovered after the onset of the project will ... become an amendment to the Phase III report.")

LHTW also states that the difference between the cost of remediation cited in the auction package and the estimates it has solicited is substantial. (Brief of Appellant at 45.) The auction package contains asbestos remediation cost estimates between $250,000 and $325,000. (Auction Package, LHTW Ex. 18A, Tab 1.) The Debtors' various disclosure statements estimate the cost of remediation as $300,000. (*See e.g.,* LHTW Ex. 23, at 15.) Estimates received by LHTW range from $1,000,000 to $15,000,000. (*See* LHTW Exs. 2, 6, 7, 8, 12, 13.) TSD estimated the asbestos cleanup would cost approximately $500,000. *In re Sugarhouse Realty*, 1995 WL 114151, at *25. However, the bankruptcy court found two of the estimates, LHTW Exhibit 6 (estimating cost of remediation as between $5,000,000 and $15,000,000) and LHTW Exhibit 8 (estimating cost as $10,175,000), unreliable because they were prepared quickly with little investigation. *In re Sugarhouse Realty*, 1995 WL 114151, at *25. Furthermore, LHTW had reason to believe the information provided by Thayer was incomplete or incorrect. In January 1994, before confirmation, TSD advised LHTW that the total remediation cost was in excess of $1,000,000. (TSD Memo, LHTW Ex. 2, at 2.)

As a bargaining tool, LHTW expressly agreed not to cap its environmental liability.

The bankruptcy court reasonably concluded that the quantity and cost of removal was not material to LHTW and that LHTW expressly bore the attendant risks when it agreed to take the property without bargaining for a clause capping liability. This court also finds no support for the contention that there was a warranty of the cost of remediation. Appellant has not proven that the Debtors breached a warranty regarding asbestos.

**(b) Groundwater and Soil Contamination**

 LHTW also claims that groundwater and soil contamination caused by the leaking USTs is a breach of warranty, thus causing a failure of a condition precedent. Again, these issues are addressed in the Brandywine Reports.[34] Phase I of the Brandywine Reports identifies the stained soil around the USTs as an area of immediate concern due to the potential for adverse environmental impact to the soil, water, and air. (*See* Brandywine Reports, Phase I, §§ 2.0, 2.1, LHTW Ex. 18A, Tab 6.) The Phase II Report also discusses the stained soil and states that testing of the soil would not be performed until remediation. (Brandywine Reports, Phase II Conclusions and Recommendations, LHTW Ex. 18A, Tab 6.) Neither report identifies the type of waste present or the quantity. Again, based on the disclosure set forth in the Reports, there is no warranty in regard to quantity or type of contamination.

**(c) PCBs**

 LHTW claims that the presence of PCBs in the main engine room and the presence of PCBs in the sediment of the Delaware River breach the warranties. (Brief of Appellant at 18.) The presence of PCBs at the Site is noted in the report prepared by PMT Associates of Maryland ("PMT"), which is incorporated as an attachment to the Brandywine Reports. (Brandywine Reports, Phase II, LHTW Ex. 18A, Tab 5.) The Brandywine Reports affirm the PMT finding.

(*See* Brandywine Reports, Phase II Executive Summary, LHTW Ex. 18A, Tab 5.)

The PMT report not only addresses the presence of PCBs generally, but also specifically identifies the main engine room as contaminated. (*See* PMT Report, LHTW Ex. 18A, Tab 5.) LHTW argues that because the EPA approved the court-ordered clean-up of the Site, it is entitled to believe that the Site is free of PCBs and that the existence of the PCBs therefore is a breach of warranty. (Brief of Appellant at 43.) However, the EPA never certified that the Site was free of PCBs. Furthermore, LHTW's own environmental consultant, TSD, recommends in its January 1994 memorandum additional sampling to determine the status of PCB contamination at the Site. (Brief of Appellant at 18.) Accordingly, this court finds that the presence of PCBs was sufficiently disclosed to LHTW, and there was no warranty of a PCB-free Site.[35]

**(d) The Army Corps of Engineers Letter**

 LHTW alleges that a breach of the warranty contained in section 7.1.7 of the Agreement of Sale occurred regarding the violation cited by the Army Corps of Engineers. This issue relates to a portion of the property known as Pier 42, which is leased to the Ultimate Sports Bar, Inc. The lessee operates an outdoor bar on the property now known as Bahama Bay. *See In re Sugarhouse Realty*, 1995 WL 114151, at *28. Portions of the pier were filled prior to 1985 for construction of a volleyball court. *Id.* The land is categorized as wetlands and is subject to federal regulation by the Army Corps of Engineers. Cease and desist orders were issued in 1985 and 1986 relating to the fill. (*See* LHTW Ex. 25, Enclosures 1–6.) The Army Corps of Engineers closed its file on the violations in 1993, marking it "Final No Action." These facts were known to LHTW. *In re Sugarhouse Realty*, 1995 WL 114151, at *28. In a letter dated March 9, 1994, the Army Corps of Engineers wrote to Thayer

---

34. The City of Philadelphia issued a violation with respect to the USTs and demanded removal and closure. Appellants were aware of this violation. (Sugarhouse II/Riverfront Concepts Agreement of Sale Ex. K, LHTW Ex. 35; Second

Amended Disclosure Statement (EPA), LHTW Ex. 58, at 11.)

35. There is also no evidence of withholding information about PCB contamination.

advising him that the area still had to be restored to its previous condition. (LHTW Ex. 25.)[36] Thayer did not disclose the existence of this letter. However, on July 11, 1994, LHTW's counsel did receive a copy of a follow-up letter from the Army Corps of Engineers to Thayer's counsel. (LHTW Ex. 27.) LHTW argues that because the first letter about the violation, which should have been attached with the Court of Common Pleas order as Exhibit D, was not disclosed, a breach of warranty 7.1.7 occurred. Thus, LHTW argues, a failure of a condition precedent also occurred. The bankruptcy court agreed that a breach occurred, but found it to be technical in nature, not material, and not a failure of a condition precedent. *In re Sugarhouse Realty*, 1995 WL 114151, at *29.

According to the Agreement of Sale, Thayer was obligated to disclose the information. Failure to do so was a breach of warranty. However, in order to excuse performance, the breach would have to have been material. The bankruptcy court found that a $30,000 cost to remedy the fill was not, in this case, material and would be neither a material breach of contract nor a failure of a condition precedent in the contract. *In re Sugarhouse Realty*, 1995 WL 114151, at *29. This court agrees and also notes that while LHTW may be entitled to a $30,000 set-off against the purchase price of the Site, it is not entitled to the extreme equitable remedy of rescission for a technical breach. *See Gloviak v. Tucci Const. Co., Inc.*, 415 Pa.Super. 123, 608 A.2d 557 (1992) (finding that the cost to repair a defect is the proper remedy unless the cost to repair is clearly disproportionate to the value of the property); *In re Humphrey's Pest Control Co., Inc.*, 80 B.R. 687 (Bankr. E.D.Pa.1987) (finding that the proper remedy for damages suffered by purchaser for seller's failure to provide a report of termite damage was cost to repair the non-disclosed defect).

### (4) Qualitative/Quantitative Distinction

 LHTW claims the bankruptcy court's use of a qualitative/quantitative distinction in its analysis was in error. *See In re Sugarhouse Realty*, 1995 WL 114151, at *19 (stating that "LHTW must establish that the information it developed post confirmation in the areas now in dispute differs materially in a *qualitative*, as opposed to *quantitative* manner from the information disclosed to LHTW.") This court disagrees. The test applied by the bankruptcy court was proper and consistent with the contract terms. Section 9.1 of the Agreement of Sale warrants that the Seller is unaware of the *existence* of any hazardous materials other than the materials set forth in the Brandywine Reports. (Agreement of Sale § 9.1, LHTW Ex. 24.) Therefore, withholding of knowledge of the existence of a type (quality) of hazardous material on the Site could breach the warranty. However, a difference in quantity between that estimated in the Brandywine Reports and that later discovered could not breach the warranties of knowledge. In the one instance where the bankruptcy court did find a breach (failure to disclose a letter received from the Corps which mandates remediation of a portion of Pier 42), it appropriately applied a test of materiality and found that the breach was not material. *See In re Sugarhouse Realty*, 1995 WL 114151, at *29.

### (5) Source of Knowledge

 LHTW also claims that "[u]nder the bankruptcy court's decision, if the debtors learned of the property's environmental condition ... from any source other than LHTW, there would be no question that LHTW could withdraw." (Brief of Appellant at 41.) It argues that the source of knowledge is irrelevant and, once the Debtors learn of the condition, LHTW may then terminate the agreement. This court does not agree with LHTW's reading of the bankruptcy court's opinion. The opinion states:

> [I]t is possible that the newly revealed information, if material, may independently breach some separate Seller's warranty ... and that such breach may excuse the Buyer's performance under the Agreement of Sale. The Court, however, rejects the

---

**36.** TSD estimates the cost to remediate and remove the fill material as approximately $30,000.

(TSD Reports, LHTW Ex. 4, at 58.)

interpretation of the paragraphs in question which suggests that where the Buyer discovers supplemental information which, qualitatively, is of a type already disclosed by the Seller, which information the Buyer then imparts to the Seller, the Buyer, merely by causing this type of subjective change to the Seller's "state of mind," can invoke the above paragraphs to avoid the Agreement of Sale.

*In re Sugarhouse Realty,* 1995 WL 114151, at *18. As previously discussed, the purpose of the relevant portions of the Agreement of Sale is to prevent the Sellers (Debtors) from withholding information from the Buyer (LHTW). If the Buyer is the source of the new knowledge, there can be no withholding. Sections 7.1, 7.1.7, 9.1, 13.2, and 13.2.1 of the Agreement of Sale, when read together, make it clear that if Debtors gained knowledge of violations not set forth in Exhibit D or gained knowledge of the existence of hazardous materials not set forth in Exhibit E and did not then disclose this information to LHTW, Sellers could then be in breach of a warranty. (Agreement of Sale, LHTW Ex. 24.) If this misrepresentation were material, then the Buyer (LHTW) would have the right to terminate the agreement. However, that is not the case here. There was no withholding of information regarding the presence of hazardous waste from LHTW.

### (6) Conditions Precedent

 Sections 13.2 and 13.2.1 of the Agreement of Sale make Buyer's obligation to close contingent on the veracity of Sellers' representations and warranties contained in the Agreement of Sale:

13.2 Buyer's obligation to close the transaction contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions precedent, any or all of which Buyer may, at its sole discretion, elect to waive by providing written notice thereof to Seller:

13.2.1 All of the representations contained in this Agreement shall have been true and correct *in all material respects* when made and shall be true and correct in all material respects on and as of the Closing Date.

(Agreement of Sale, LHTW Ex. 24 (emphasis added).) LHTW is correct in its assertion that the remedy for failure of a condition precedent is different from the remedy for a breach of warranty. (Reply Brief of Appellant at 24.) A breach of warranty must be material to excuse performance, the remedy sought. *Oak Ridge Constr. Co. v. Tolley,* 351 Pa.Super. 32, 504 A.2d 1343, 1348 (1985). Generally, the failure of a condition precedent can excuse performance by the non-breaching party. Restatement (Second) of Contracts § 225 (1981). However, in drafting the Agreement of Sale, LHTW did not require that the conditions precedent be complied with strictly, that is, in all respects, but rather that they be complied with in all material respects, a lesser standard.

The question is whether the warranties could be true in all material respects at Closing, not whether they have been deviated from at all. The only breach found was a breach of the warranty in section 7.1.7. The Debtor warranted in section 7.1.7:

Seller has not received notice of any violation of any environmental law or regulations and seller is *aware* of no violation of any environmental laws or regulations, except as set forth on Exhibit D attached hereto and made part hereof.

(Agreement of Sale, LHTW Ex. 24 (emphasis added).) As discussed, Thayer did not disclose the first letter relating to the fill issue, which he received after confirmation. However, he did disclose the follow-up letter relating to the excavation and restoration. The purpose of the section 7.1.7 was to assure disclose of all pertinent information, and if any changes occurred that were material, to permit termination. As discussed previously, Thayer's non-disclosure of the original letter was a technical breach, not a material breach that would warrant termination.

The remaining warranty, section 9.1, reads:

Seller represents and warrants to Buyer as being true and correct as of the date hereof and on the Closing Date as if then made, that it is *unaware* of the *existence* of any hazardous materials or storage tanks in, on, under, about or affecting the Property except as set forth in environmental

reports and studies obtained by the Sellers and listed on Exhibit E attached hereto and made part hereof (the "Environmental Reports"). Copies of all environmental reports and estimates for removal of hazardous materials and storage tanks have been furnished to Buyer and are listed on Exhibit E.

(Agreement of Sale, LHTW Ex. 24 (emphasis added).) The above was true in all material respects when made and will be true at Closing. Although Debtor now is aware of different quantities of substances, it is not aware of the existence of hazardous materials other than the types identified in the Brandywine Reports. Further, LHTW has not been deprived of the benefit of its bargain.

The context is critical to an understanding of the parties' intent. It would defeat the purpose of a bankruptcy proceeding to allow a party that drafted the contract and vigorously pursued confirmation to withdraw from the agreement post-confirmation. Confirmation proceedings are intended to be final. *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 417 (3d Cir.) ("A strong interest to achieve finality pervades Chapter 11 arrangements."), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). There is no question that LHTW intended to be bound by the bankruptcy court order—it pursued the parties and drafted the memoranda, the Plan, and the Confirmation Order. Upon consideration of the contract as a whole and the context in which the contract was made, the court does not find merit in LHTW's argument that the warranties were of quantity or condition.

LHTW urges that affirming the bankruptcy court opinion will set an unwise precedent and paints itself as an unwitting buyer who was induced to purchase land by misrepresentations of the Seller. This court is not persuaded. As the bankruptcy court found, the property was a well-known "Pandora's Box" of environmental problems that LHTW early on stated it was ready, willing, and able to handle. Put simply, LHTW bargained for a parcel of land with a large unspecified quantity of environmental contamination, and that is what it received.

This court finds that the parties' intent was that any due diligence investigations were to be completed prior to confirmation to determine whether LHTW wanted to contract for the purchase of the Site. If LHTW's investigation at that point revealed unfavorable information, the remedy was to withdraw the offer. After the Plan was confirmed, the warranties guaranteed that the Debtors had supplied all the information they had and would continue to do so until Closing. Because no material breaches warranting termination have occurred and the Debtors' representations are still true in all material respects, LHTW is still bound to close.

### III. CONCLUSION

For the above reasons, this court affirms the decision of the bankruptcy court. An appropriate order follows.

### *ORDER*

**AND NOW,** this 17th day of January, 1996, it is hereby ordered that the decision of the bankruptcy court in *In re Sugarhouse Realty, Inc.,* Nos. 92–23024 SR, 92–24533 SR, 93–22920 SR, 1995 WL 114151 (Bankr. E.D.Pa. March 15, 1995), is **AFFIRMED.**