**In re H. Larry PENBERTHY, Debtor.**

**Bankruptcy No. 94–08427.**

United States Bankruptcy Court, W.D. Washington.

July 24, 1997.

As Amended Aug. 29, 1997.

H. Larry Penberthy, Seattle, WA, Pro se.

Tyler K. Firkins, Auburn, WA, for Alma Penberthy.

Daniel P. Brink, Seattle, WA, for ToxGon Corp.

## DECISION ON MOTIONS RE CONFIRMED PLAN

PHILIP H. BRANDT, Bankruptcy Judge.

### I. ISSUES

A. Where the debtor undertook in the disclosure statement to contribute certain amounts beyond those specified the confirmed plan, is that undertaking enforceable?

B. If so, may a creditor withhold or offset a payment in lieu of homestead to the debtor, provided for in the confirmed (and consensual) plan, when the debtor has not made the contributions?

In the circumstances of this case, I conclude debtor must pay, but that his failure does not excuse the creditor's obligation. However, the payment must be available to fund the plan, unless and until the debtor fulfills his obligations.

### II. BACKGROUND

Debtor H. Larry Penberthy filed this individual Chapter 11 [1] case on 26 October 1994. The debtor's largest creditor was ToxGon Corporation ("ToxGon"), which obtained a $1.33 million jury verdict in state court against Penberthy and his corporation, Penberthy Electromelt International ("PEI"), prior to the bankruptcy filing. Judgment was entered after relief from the automatic stay was granted.

Penberthy and PEI appealed the judgment, but thereafter reached a settlement with ToxGon, which was effectuated through debtor's consensual Second Amended Plan, confirmed 18 October 1995.

The plan provides, among other things, for the transfer of Penberthy's residence to ToxGon, subject to his right to reside in the home for two years, provided he pays the taxes and insurance on it, and $200.00 per month to ToxGon. Article V provides:

> One year after confirmation of the debtor's plan, ToxGon shall pay the sum of $30,-000.00 cash to Penberthy. If ToxGon does not do so, Penberthy may live in the house or lease it to others until the payment is made, and Penberthy shall have no duty to ToxGon to pay taxes on the home, to insure the property nor to make monthly $200.00 payments. If ToxGon does not pay the $30,000.00 when due, ToxGon must also pay 12% interest on the unpaid sum until the payment is made.

---

1. Of the Bankruptcy Code, 11 U.S.C.: Absent contrary indication, all section and chapter references are to the Bankruptcy Code, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure. "LBR" refers to the Local Rules of Bankruptcy Procedure for the Western District of Washington.

ToxGon agreed in Article VI to subordinate its unsecured claim as an inducement to unsecured creditors to vote for Penberthy's proposed plan:

After liquidation of all of the Debtor's non-exempt property, except that which is subject to the lien rights of ToxGon, the allowed costs and expenses of the administration of the bankruptcy estate, including all fees authorized by the Court to be paid to Penberthy's counsel and accountant, and any and all fees due the Office of the United States Trustee, shall first be paid. Thereafter, $10,000.00 shall be paid pro rata to unsecured creditors other than ToxGon. After such payment to the creditors other than ToxGon, all other funds shall be paid to ToxGon.

Penberthy's First Amended Disclosure Statement of 1 August 1995 was approved by the court on 6 September 1995. Article V of the disclosure statement, entitled "Probable Amount Payable to Unsecured Creditors", states, after listing bank accounts containing $31,959.00 of non-exempt cash:

The amount that is paid to creditors depends upon the allowance to the professionals in the case. Assuming professional fees are paid in the amount [of] $20,000.00, since $31,959.00 cash is on hand, the sum of $11,959.00 would then be available to pay unsecured creditors' claims. *However, since the Debtor will contribute certain post petition earnings,* the amount of cash to pay such claims will be the sum of $50,159.00.

The debtor maintains an account for the purposes of segregating his exempt property from property of the bankruptcy estate. The account is at U.S. Bank. The present balance of the account is approximately $66, 948.00. This account balance represents what the debtor claims is exempt post petition earnings of the debtor, and is thus not property of the bankruptcy estate. Nonetheless, distribution to creditors will be made from this account, to the extent of the consultant's fee and from the debtor's earnings from the Westinghouse Hanford contract.

The proceeds of this account are from the following sources:

(a) Net administrative salary from PEI in the amount of $34,800.00;

(b) Consultant fee of $900.00 from Mountain Safety Research;

(c) The balance of approximately $32,000.00 represents payments of employment earnings as senior activist on the Westinghouse Hanford contract. [emphasis added]

Paragraph 5 of the Order Confirming Debtor's Second Amended Plan indicates that the Second Amended Plan differed from the First Amended Plan, which had been circulated with the approved First Amended Disclosure Statement, only in provisions to assure favorable tax treatment for Penberthy. The court found the changes had no adverse effect on any creditors.

After confirmation, debtor complied with certain plan provisions, including transfer of the residence to ToxGon. However, Penberthy made no post confirmation payments on administrative claims or to unsecured creditors.

ToxGon's $30,000 payment was due one year after confirmation, or 18 October 1996. On 16 September 1996, ToxGon filed its motion to Compel Compliance with the Plan. Specifically, ToxGon argued that it should not be required to pay the $30,000 when Penberthy had not paid any of the amounts due to unsecured creditors, including ToxGon. ToxGon referred to the quoted disclosure statement language, which by ToxGon's calculations, would have resulted in a $40,159.00 payment to ToxGon, "out of which it could easily pay the $30,000 back to debtor in lieu of his homestead allowance of $30,000."

Debtor's former counsel filed a response to ToxGon's motion, arguing that his firm had not received any payment of its allowed fees, and that, to the extent the court orders compliance with the plan, administrative claims should be paid first.

After hearing, the court entered an order on 23 October 1996 suspending ToxGon's obligations under the plan until further order. Specifically, the order provided that (a) ToxGon would not be required to pay the $30,000 to Penberthy until further order of the court; (b) interest would not accrue on the $30,000

until further order of the court; and (c) all other provisions of the plan would remain fully in force. In particular, Penberthy is required to keep the property fully insured against fire for the full economic value of the residence, keep the taxes current, and to pay $200 per month to ToxGon.

On 30 December 1996 debtor filed his Motion for Reinstatement of Homestead Provisions in Plan requesting that the court reverse the 23 October order and reinstate ToxGon's obligations under the plan. The debtor argues that he is bound only by the plan provisions, and not the language in the disclosure statement. Because the disclosure statement contains the contribution language, while the plan does not, Penberthy contends he should not be required to contribute any post-petition earnings. ToxGon, on the other hand, argues that the plan and disclosure statement should be construed together so that the debtor is bound to contribute funds. Consequently, ToxGon argues, the debtor should be ordered to pay $10,000 to unsecured creditors, and pay ToxGon $40,-159. Otherwise, ToxGon contends it should be excused from paying the $30,000 and be given an offset or judgment for the unpaid balance.

### III. JURISDICTION

ToxGon's Motion to Compel ... and Penberthy's Motion for Reinstatement ... are core proceedings within this court's jurisdiction. 28 U.S.C. §§ 157(b)(2)(A), (L) and (O); GR 7, Local Rules, W.D. Wash.

### IV. DISCUSSION

In essence, the parties ask this court to interpret the provisions of the debtor's confirmed plan and to enter an order, pursuant to § 1142(b), requiring the parties to carry out their respective obligations. That section provides:

> The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

Under the Bankruptcy Code,

> Except as provided ... the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

Section 1141(a).

A Chapter 11 reorganization plan "resembles a consent decree and therefore should be construed basically as a contract." *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n.*, 997 F.2d 581, 588 (9th Cir.1993). State law governs the interpretation of a plan. *In re Affordable Housing Development Corp.*, 175 B.R. 324 (9th Cir. BAP 1994).

#### A. Debtor's Obligation to Fund Plan.

What weight should be given the disclosure statement in construing a confirmed plan? The debtor argues none, relying on *In re Sonoma V,* 34 B.R. 758, 761 (9th Cir. BAP 1983): "Whatever was said in the disclosure statement, the language of the plan itself is controlling."

ToxGon cites *In re Sugarhouse Realty, Inc.*, 192 B.R. 355 (E.D.Pa.1996) and *In re Erie Hilton,* 137 B.R. 165 (Bankr.W.D.Pa. 1992) to support its argument that the plan and disclosure statement should be construed together. "According to bankruptcy law, the confirmed plan or contract includes 'all documents which were confirmed together to form the contract.' " *In re Sugarhouse Realty, Inc.*, 192 B.R. at 363 (quoting *In re Erie Hilton,* 137 B.R. at 171). A copy of the disclosure statement was attached to the *Erie Hilton* confirmation order along with the plan, and the court construed a broad incorporation by reference in the *Sugarhouse* plan to include the disclosure statement.

The court in *Sugarhouse* stated that a disclosure statement may be used under general contract principles to aid in plan inter-

pretation: "Even if the Disclosure Statement were not part of the contract, 'it is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties.'" 192 B.R. at 363, n. 15 (citations omitted). The courts in *Sugarhouse* and *Erie Hilton* both enforced obligations undertaken in disclosure statements which were consistent with, but not explicit in, the plans, applying general contract principles.

In contrast with *Sugarhouse* and *Erie Hilton,* the provisions in the plan and disclosure statement in *Sonoma V* contradicted one another: the plan provided for full payment to certain creditors, while the disclosure statement disclaimed full payment to them. Further, the "plan controls" language on which Penberthy founds his argument is an aside in the Panel's discussion of the law of the case arising out of a prior appeal.

■ Here, Penberthy's plan and disclosure statement are not contradictory. Instead, the disclosure statement contains statements the plan does not—that the debtor has non-exempt funds on hand, and will contribute post-petition earnings to make plan payments. This is an elaboration on, and not a contradiction of, the plan.

■ Washington courts have adopted the "context rule" in interpreting contracts. Extrinsic evidence of the circumstances under which the contract was made is admissible as an aid in ascertaining the parties' intent, and ambiguity is not a prerequisite. *Berg v. Hudesman,* 115 Wash.2d 657, 666, 801 P.2d 222 (1990). The surrounding circumstances include "agreements and negotiations prior to or contemporaneous with the adoption of a writing." (citing Restatement (Second) of Contracts § 214(c)); in addition, a court may consider the reasonableness of the parties' respective interpretations. *Berg,* 115 Wash.2d at 668–669, 801 P.2d 222. The extrinsic evidence may explain, or indicate the parties' intent, but may not contradict the contract. *Emrich v. Connell,* 105 Wash.2d 551, 556, 716 P.2d 863 (1986).

Applying Washington's context rule, the disclosure statement is the single most relevant document, after the plan itself, for ascertaining the intent of the parties. The disclosure statement's purpose is to give creditors information on which to base their acceptance or rejection of a plan. § 1125(b).

Here, Penberthy's plan states that $10,000 will be paid to unsecured creditors after payment of administrative expenses, with any remaining funds to be paid to ToxGon. Unfortunately, these plan provisions are written in the passive voice and state neither who will make the payments nor the source of the funds. However, the disclosure statement, with which he solicited the votes on which the confirmation was predicated, unequivocally say Penberthy will contribute the $31,959.00 of non-exempt cash and post-petition earnings of $32,900.00.

There are other reasons, besides contract principles, to hold Penberthy to his disclosure statement: first, judicial estoppel:

> [e]ven if we assume that a bankruptcy disclosure statement is not enforceable as a contract, it is at least a representation which in appropriate circumstances can serve as the basis for judicial estoppel.

*Donaldson v. Bernstein,* 104 F.3d 547 (3d Cir.1997).

As noted by the Ninth Circuit in *Milgard Tempering, Inc. v. Selas Corp. of America,* 902 F.2d 703, at 716 (1990):

> This circuit has recognized that the doctrine of judicial estoppel precludes parties from taking inconsistent positions in the same litigation but has yet to state the requirements for the doctrine's application. The majority view is that the doctrine is inapplicable unless the inconsistent assertion was actually adopted by the court in the prior litigation. This view recognizes that absent judicial adoption of the prior position, there is no risk of inconsistent results.
>
> The minority view is more broad, extending judicial estoppel in all cases where the offending party has played "fast and loose" with the court, even if ultimately unsuccessful. [citations omitted]

■ Here, under either view, Penberthy is estopped from asserting he has no obligation to contribute the non-exempt funds and post-petition earnings identified in his disclosure statement: the court, in finding feasible and confirming Penberthy's plan necessarily adopted the position he had asserted in his disclosure statement, for there was no other source of funds for the payment of administrative and creditors' claims (although Tox-Gon received property). Penberthy has also obtained substantial benefits as a result of that confirmation: a discharge (including his obligation to ToxGon, which according to his disclosure statement might well have been nondischargeable), and a residence at nominal rent for over a year. Penberthy's attempt to renege evidences considerable speed and slack, and is barred by judicial estoppel.

■ Second, the debtor is responsible for carrying out the terms of the confirmed plan:

Notwithstanding any otherwise applicable non-bankruptcy law, rule, or regulation relating to financial condition, *the debtor* and any entity organized or to be organized for the purpose of carrying out the plan *shall carry out the plan* and shall comply with any orders of the court. [emphasis added]

Section 1142(a).

■ Parenthetically, the debtor has persistently attempted to disclaim responsibility for his disclosure statement and plan. Penberthy repeatedly alleges misfeasance, malfeasance, and conspiracy by his former counsel, ToxGon, and ToxGon's counsel. Even had Penberthy not signed the disclosure statement and confirmed plan, and not attended the hearings to approve the first and confirm the latter (testifying in support of confirmation), his attempted evasion would fail:

An attorney and counselor has authority:

(1) To bind his client in any of the proceedings in an action or special proceeding by his agreement duly made, or entered upon the minutes of the court; but the court shall disregard all agreements and stipulations in relation to the conduct of, or any of the proceedings in, an action or special proceeding unless such agreement or stipulation be made in open court, or in presence of the clerk, and entered in the minutes by him, or signed by the party against whom the same is alleged, or his attorney; ...

Wash. Rev.Code 2.44.010.

Holding Penberthy to the representations of his counsel in what is, after all, a court-approved contract is no more onerous than dismissal of a party's lawsuit because of the derelictions of his attorney, which the Supreme Court has expressly upheld:

There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney." *Smith v. Ayer,* 101 U.S. 320, 326[, 25 L.Ed. 955].

*Link v. Wabash Railroad Co.,* 370 U.S. 626, 633–634, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962). *See also Toth v. Trans World Airlines, Inc.,* 862 F.2d 1381, 1387 (9th Cir.1988) and *Chism v. Nat'l Heritage Life Ins. Co.,* 637 F.2d 1328, 1332 (9th Cir.1981).

Penberthy is bound under the plan to contribute the non-exempt funds and his post-petition earnings to the extent set forth in the disclosure statement. However, Tox-Gon's conclusion that it should receive $40,-159.00 does not follow.

■ Although the plan does not specify an amount to be paid to ToxGon, Article V of the disclosure statement (quoted at p. 394, above) explains that the amount to be paid to creditors depends upon the allowance to the professionals in the case. The language following this statement is an example of the distribution that would be made if the administrative expenses total $20,000.00. The next sentence states that after the debtor's

contribution of post-petition earnings, the amount of cash to pay "such claims" will be the sum of $50,159.00. ToxGon apparently reads "such claims" as referring to creditors other than administrative claimants. Although Penberthy has made no fallback argument challenging Toxgon's interpretation, "such claims" could also refer to the total of administrative claims, unsecured creditors other than ToxGon, and ToxGon. Toxgon's construction collides with the statement in Article II of the Plan that "all unsecured creditors, including ToxGon, will receive a distribution of less than $50,000.00. . . ." The other unsecureds cannot receive $10,-000.00, and ToxGon $40,159.00, from less than $50,000.00.

The unambiguous figures set forth in the disclosure statement, in addition to the $10,-000.00, are the $31,959.00 in nonexempt cash, Penberthy's consultant's fee of $900.00, and his Westinghouse Hanford earnings of $32,-000.00. Debtor represented he had and would contribute these amounts, which total of $64,859.00. Of course, Penberthy held the non-exempt funds as a fiduciary, and had no right not to contribute that money.

After subtracting the administrative expenses, estimated at $25,000.00 in the disclosure statement, approximately $40,000.00 would be available to creditors, which is consistent with Article II. ToxGon is entitled to what is left after payment of the administrative expenses and the $10,000.00 to the other unsecured creditors out of $64,859.00.

## B. *Must ToxGon pay while Penberthy has not funded the plan?*

ToxGon asserts that it should not be required to pay the $30,000 for debtor's homestead rights as provided in the plan until the debtor complies with his obligations under the plan. ToxGon apparently invokes the court's equitable powers in this request for relief, as nothing in the plan indicates that Penberthy's obligation to pay ToxGon under Article VI is a condition precedent to Tox-Gon's duty to perform under the plan.

■■■■ Conditions precedent are those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available. A breach of a promise subjects the promisor to liability in damages but does not necessarily excuse performance on the other side, nonperformance or nonoccurrence of a condition prevents the promisee from acquiring a right, or deprives him of one, but subjects him to no liability. *Ross v. Harding,* 64 Wash.2d 231, 236, 391 P.2d 526 (1964). Conditions precedent are not favored, *Fischler v. Nicklin,* 51 Wash.2d 518, 521, 319 P.2d 1098 (1958); if any doubt exists whether words create a promise or a condition, they are interpreted as creating a promise. *Ross v. Harding,* 64 Wash.2d at 236, 391 P.2d 526. Applying these principles, I cannot interpret the plan (or plan and disclosure statement) as making Penberthy's payment into the plan a condition precedent to Toxgon's obligation.

ToxGon's equitable argument would be compelling if it and Penberthy were the only interested parties. But they are not: there are also other creditors and administrative claimants. Penberthy has stated in various pleadings that the nonexempt (i.e., estate) funds referenced in his disclosure statement "have been exhausted", although he has not provided any accounting, and he has acknowledged, in his Third Reply . . . that he "declined to make any such donation [of his consultant's fee and Westinghouse Hanford earnings]". It is uncontested that none of the creditors has been paid, and that the only administrative claimants who have been paid since confirmation were special counsel and debtor's accountants, and they were paid out of a preconfirmation retainer held by special counsel.

■■■■ As Penberthy's payment to creditors is not a condition precedent to ToxGon's obligation to pay the homestead amount, that obligation is not excused by debtor's failure to fund the confirmed plan. However, the same equitable considerations preclude Penberthy from receiving the benefit of the plan's homestead provision, Article V, quoted above at page 393, unless and until he performs his undertaking to contribute $32,-900.00 of his exempt funds, and accounts for

the non-exempt funds, the homestead equivalent must be available for distribution under the plan. Once ToxGon has made the payment in lieu of homestead, it will be entitled to possession of the house in accordance with the plan.

## V. CONCLUSION

1. Respecting the first issue, the court is not limited to the plan's text in construing it, but may also (consistently with state law) consider consistent provisions of the disclosure statement; and

2. Respecting the second, under the provisions of Penberthy's plan, his payment to creditors is not condition precedent to Tox-Gon's obligation to make the payment in lieu of homestead. However, as the debtor has neither contributed the exempt funds he promised, nor accounted for the non-exempt funds, I will order (under §§ 105 and 1142(b)) that ToxGon's payment be applied for the benefit of creditors unless Penberthy promptly makes his promised contributions.

I will enter an order so providing, and, if necessary, will appoint a plan administrator to enforce the order and carry out the confirmed plan.