**In re SEAVIEW ESTATES, INC., Debtor.**

**Bankruptcy No. 895–80536–478.**

United States Bankruptcy Court,
E.D. New York.

Oct. 7, 1997.

Norman Mendelson, Mendelson & Associates, Great Neck, NY, for Debtor.

Barry J. Dichter, Cadwalader, Wickersham & Taft, New York City, for Lennar U.S. Partners Limited Partnership.

John Smargiassi, Michael Jude Januzzi, Huntington, NY, for Patsy Strocchia & Sons Iron Works, Inc.

K. Renee Schimkat, Pollack & Green, L.L.P., New York City, for Macro Enterprises, Ltd. and Leeds Painting.

## DECISION CONVERTING CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

DOROTHY EISENBERG, Bankruptcy Judge.

Before the Court is a motion by Patsy Strocchia & Sons Iron Works, Inc. ("Strocchia") to convert or dismiss the Chapter 11 case of Seaview Estates, Inc. (the "Debtor"), which motion was joined by Macro Enterprises, Ltd., and Leeds Painting and Decorating Corporation ("Macro" and "Leeds," respectively). Lennar U.S. Partners Limited Partnership ("Lennar") has joined the motion insofar as the motion seeks a conversion of the case to Chapter 7. The Debtor has opposed the motion, claiming that the Debtor's Plan has been substantially consummated and that grounds to convert the Debtor's case do not exist. Instead, the Debtor seeks entry of a final decree and closure of the case. Given this Court's finding that the Debtor has materially defaulted under the Plan, grounds exist to convert the case to a case under Chapter 7 pursuant to 11 U.S.C. Section 1112(b)(8). Additional grounds exist which favor conversion of the case over closure or dismissal of the case. Conversion of the case will prevent an unjust result to certain creditors who agreed to waive their right to enforce third party guarantees in exchange for payment pursuant to the Plan, and who did not receive the benefit of the bargain. Moreover, unadministered assets may be available for distribution to creditors. Therefore, although there has been substantial consummation pursuant to the Plan, the Court finds that it is in the best interest of

the creditors to convert the case to a case under Chapter 7.

FACTS

The Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code on January 30, 1995. As of the petition date, the Debtor owned and managed property consisting of 190 residential condominium units together with indoor and outdoor parking, a swimming pool, tennis courts and a health club on more than three acres of property located at Seaview Avenue and East 108th Street, Brooklyn, N.Y. (the "Property"). Lennar held a construction loan secured by a mortgage on the Property and was owed in excess of $31 million as of the petition date.

The filing of the petition was prompted by Lennar's refusal to extend the deadline on a temporary forbearance agreement which was entered into between the Debtor and Lennar's predecessor, Chemical Bank, to give the Debtor the opportunity to obtain financing from the New York State Housing and Finance Authority ("HFA"). After the filing of the petition, the Debtor and Lennar negotiated a cash collateral agreement, and Lennar brought on a motion to vacate the stay. The motion to vacate the stay was conditionally granted by the Court but no sale of the Property was to take place prior to May 1995.

During the same time period, the Debtor obtained approval from SONYMA for mortgage insurance and HFA issued a mortgage commitment. The Debtor and Lennar entered into active negotiations regarding settlement of their outstanding issues, and the parties worked out the terms of a Plan of Reorganization. The Debtor's Plan as amended dated September 11, 1995 was confirmed by order dated October 2, 1995.

The Plan designated five classes of claims and interests as follows:

1. Administrative Claims
2. Priority Claims
3. Secured Claim held by Lennar
4. General Unsecured Claims
5. Equity Interest

Pursuant to the Plan, Lennar, as the sole Class 3 creditor, was to accept $15 million in satisfaction of its debt, of which $14.9 million was to be generated by the refinancing of the property and the sale of low income tax credits, and $100,000 was to be paid by a third party on the date the Debtor's Plan became effective. The financing was to occur by December 15, 1995 or by such period as extended by Lennar. Failure to timely obtain the funding triggered an event of default under the Plan, and the Property was to be sold pursuant to a Section 363 sale to Lennar for $13 million, subject to higher offers.

Class 1 claims, consisting of administration claims and expenses, were unimpaired and would be paid by the Debtor within ten (10) days from the time that the amounts were fixed by the Court, unless other terms were agreed to between the Debtor and the individuals in question.

Class 4 claimants consisted of unsecured creditors. The aggregate of Class 4 claims allowed were to total approximately $1,666,-634.19. Article 3.4 of the Plan provides for the treatment of the unsecured creditor claims as follows:

> [A]ll creditors with allowed claims in this class will receive pro-rata distribution with respect to the amounts allowed. The Debtor will pay a distribution to Class 4 Claimants of approximately 35% of the allowed claims in such class pro-rata, payable in full *on* or *before* the Funding Date. The distribution to Class 4 creditors will result in a present value of their claim of approximately 33.75% of their Allowed Claim. The payment to Class 4 Claimants will be $583,321.97 provided that the payment to the Class 3 Claim is timely made. [Emphasis added].

The "Funding Date" is defined in the Plan as the "date on which Lennar is paid $15,000,-000 in cash in satisfaction of its Allowed Claim."

There are two other provisions in the Plan which bear greatly on the rights and remedies of the unsecured creditors. First, Art. VI of the Plan provides in pertinent part:

> In the event the Debtor fails to pay the sums as provided in Article III, upon any of the events described, then any Class of claim holders may declare the Debtor in

default and seek such relief as may be appropriate, including the conversion of this case to Chapter 7 of the Bankruptcy Code.

Another provision of the Plan which directly affects the rights of certain of the unsecured creditors is Art. 10.5. Several of the unsecured creditors held personal guaranties from James C. Gherardi, the sole shareholder and President of the Debtor (the "Guaranty Creditors"). This Article provides for the release of any claims against, *inter alia,* James C. Gherardi as follows:

> Except with respect to Lennar, ... all claims based upon guaranties of collection, payment or performance, indemnity bonds or obligations, performance bonds or contingent liabilities, arising out of the assignment of leases or contract obligations, or other similar undertakings made or given by the Debtor and James C. Gherardi, Sr., as to the obligations or performance of Debtor, another debtor, creditor or of any other person, shall be discharged, released and of no further force and effect, subject only to the rights under the Plan of respective claimants....

Little took place before the Court immediately after confirmation except for the disposition of several adversary proceedings commenced by the Debtor to collect past due rent from certain tenants. The December 15, 1995 deadline for the Debtor to obtain financing as set forth in the Plan came and passed, and the Debtor had yet to make one distribution under the Plan. Shortly thereafter, the unsecured creditors received a mailing from the Debtor entitled "Progress Report and Update" dated January 3, 1996. (Lennar's Exh. 1 ). The Progress Report stated that the refinancing was imminent, and the Debtor had taken all steps necessary to obtain the funding.

On March 5, 1996, Winfield Security Corporation, an unsecured creditor of the Debtor, made a motion to declare the Debtor in default for failure to make any payment to unsecured creditors as required under Art. III of the Plan, and seeking to convert the case or seeking an order of revocation of Art. 10.5 of the Plan. The motion was joined by L & M Distributors Inc. on May 14, 1996 and

carried on the Court's docket for several months thereafter.

In the meantime, on March 18, 1996, Lennar had made a motion to approve the Sec. 363 sale of the Property to Lennar based on the Debtor's default under the Plan. Apparently, the Debtor and Lennar continued to negotiate and a tentative agreement was reached by the Debtor and Lennar whereby the Debtor would continue to seek to obtain the financing and Lennar would accept payment in a reduced amount. On July 3, 1996, the Debtor filed a motion to amend the Plan post-confirmation to reflect the understanding reached by the Debtor and Lennar. Certain unsecured creditors, including Macro, Leeds and Strocchia, objected to the amended Plan and requested that the Debtor delete Art. 10.5 from the proposed amended Plan. The Court directed the Debtor to brief the issue of whether in the event the Debtor's request to amend the Plan was approved by the Court, sufficient cause existed to retain this provision over the objection of these creditors. The issue became moot as a result of the Debtor's withdrawal of its motion to amend the Plan in September, 1996. At or about the time of the Debtor's withdrawal of the motion to amend the Plan, Winfield Security Corp. withdrew its motion to convert the case. Lennar's application to conduct a § 363 sale at that time was also withdrawn, since the Debtor claimed that it was close to obtaining all the financing that it had set forth in the Disclosure Statement.

On October 11, 1996, Macro and Leeds made a motion to revoke or nullify Art. 10.5 of the Plan, and Strocchia made a similar motion as well. This motion was ultimately denied at a hearing held on January 9, 1997, since no timely appeal had been taken from the Order of Confirmation, nor had a timely motion been filed to modify the Plan, and the Debtor produced witnesses to support its claim that it was about to receive its necessary financing which would enable it to consummate the confirmed Plan of reorganization.

Several times, Lennar renewed its motion to conduct the Section 363 sale and the Debtor opposed the motion at every turn. Lennar withdrew its motion several times, appar-

ently under the belief that the Debtor could obtain the financing it had been seeking since the commencement of the case. The Plan had been confirmed by order dated October 2, 1995. The Plan was to have been consummated by December 15, 1995. This had not happened.

By Order dated March 10, 1997, the Court directed the Debtor to apply for a final decree on or before April 1, 1997 or show cause on that date why its Chapter 11 case should not be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code pursuant to 11 U.S.C. Section 1112(b). On March 20, 1997, Lennar's application to approve the sale of the Property pursuant to the confirmed Plan was renewed, and at a hearing held on April 1, 1997 on both matters, the Debtor represented that it was about to obtain its financing. The Debtor was given one last chance until May 5, 1997 to obtain the financing. The Debtor could not obtain the requisite financing and the sale of the Property to Lennar took place on May 5, 1997.

On July 7, 1997, Strocchia made the instant motion to convert the case, which portion of the motion seeking conversion was joined by Lennar, Macro and Leeds. The "Funding Date" as defined in the Plan has never occurred, and the unsecured and administration creditors have received no payment whatsoever under the Plan. In fact, there are no assets remaining in the Debtor's possession from which the Debtor can fund the Plan.

Lennar has made allegations that a percentage of first monthly rents were regularly diverted as a commission to an individual whose retention and compensation had not been approved by the Court and that the balance of the first month rents were paid to the Debtor's principal in cash. The financial reports prepared by Michael Gherardi, the son of James Gherardi, do not reflect these cash payments. Lennar also alleges that unadministered assets may exist for the benefit of the unsecured creditors. For example, an issue exists as to whether the Debtor's estate is entitled to retain any of the tax credits generated from the Property. If the case is not converted, and a final decree is entered instead, the assets, if any, will inure to the benefit of the sole shareholder.

The Debtor opposes the motion to convert or dismiss, and insists that since substantial consummation of the case has taken place, the next appropriate step is the entry of a final decree and closure of the case. The Debtor further alleges that pursuant to Art. VI of the Plan, the unsecured creditors lost their right to seek conversion of the case once the Section 363 sale of the Property took place, since they had to know from the Plan and Disclosure Statement that they would receive nothing in the event the Section 363 sale took place.

## DISCUSSION

 The first issue before the Court is whether the Debtor's Plan has been substantially consummated, and if substantial consummation has taken place, whether this Court can consider the motion by the unsecured creditors to convert or dismiss the case. It is clear to this court that substantial consummation of the Plan has occurred. Section 1101(2) of the Code defines substantial consummation as the:

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

The parties are in agreement that the case has been substantially consummated as a result of the transfer of the property to Lennar pursuant to the § 363 sale. The parties diverge as to the legal effect that substantial consummation has on the outstanding motion to convert the case. The Debtor urges the Court to find that entry of the final decree is appropriate at this juncture. Strocchia and Lennar, argue, however, that grounds exist to convert this case despite substantial consummation.

Section 1112(b)(8) of the Code provides as follows:

(B) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(8) material default by the debtor with respect to a confirmed plan.

This Court finds that regardless of the fact that substantial consummation of the plan has taken place, the facts warrant conversion to Chapter 7 under Section 1112(b)(8) for cause shown. As the Bankruptcy Appellate Panel for the Ninth Circuit held in *In re Greenfield Drive Storage Park,* "whether the plan has been 'substantially consummated' is not determinative of whether there has been a material default in the performance of the plan." *Greenfield Drive Storage Park v. California Para–Professional Servs., Inc. (In re Greenfield Drive Storage Park),* 207 B.R. 913, 917 (9th Cir. BAP 1997). Courts have routinely converted cases after substantial consummation based on a subsequent material default by the debtor under the plan. *See In re Greenfield Drive Storage Park,* 207 B.R. at 916–17; *In re Kaleidoscope of High Point,* 56 B.R. 562 (Bankr.M.D.N.C. 1986) (Chapter 11 case converted after order of substantial consummation was entered due to the debtor's inability to pay fees awarded to an examiner); *In re Micro–Acoustics Corp.,* 49 B.R. 630 (S.D.N.Y.1985) (Chapter 11 case converted where debtor discontinued payment under the plan and debtor's remaining assets were to be sold at auction). *See also* 7 Lawrence P. King *Collier on Bankruptcy* Para. 1112.04[5][h] at 1112–46 (15th Ed. Revised 1997).

The Debtor's analysis regarding the effect of substantial consummation fails to take into account the fact that there are creditors other than Lennar in this case, which have certain rights and remedies pursuant to the Plan and the Code. It is true that Lennar has been fully treated under the Plan, but this does not warrant the entry of a final decree. The Debtor is bound by the terms contained in the Plan and Disclosure Statement, provided they are not contradictory. *See In re Penberthy,* 211 B.R. 391 (Bankr. W.D.Wash.1997). The unsecured creditors, with claims totaling in excess of $1.6 million had an expectation to be paid under the terms of Art. 3.4 of the Plan and the language of the Disclosure Statement. Based on a reading of the Disclosure Statement and Plan as a whole, the unsecured creditors were entitled to get paid on or before the "Funding Date" from a combination of the Debtor's revenues, the tax credits and the refinancing. There are no statements contained in the Plan or Disclosure Statement which contradict this understanding, or which spell out that in the event the refinancing did not occur, the unsecured creditors were to get nothing.

The Debtor points to the last sentence of Art. 3.4 of the Plan to support its contention that the Class 4 creditors were advised that they would not receive payment if the Class 3 creditor was not timely paid. The language in this paragraph merely states that Lennar was to be paid first. It does not state that should Lennar conduct the Section 363 sale, then the unsecured creditors would receive nothing. Were the Court to adopt the Debtor's position that the final sentence should be read independently of the first portion of the paragraph, the final sentence would subsume the remainder and the first portion would be rendered meaningless. The creditors correctly relied on the Debtor's promise to pay a percentage of their claims in cash in exchange for the Guaranty Creditors' release of the personal guarantees, and the votes of the other unsecured creditors in favor of confirmation of this Plan. This cash payment would pay all allowed unsecured creditors a portion of what was owed to them, in exchange for permitting the Class 5 equity owner to retain ownership and control of the Debtor.

If the Court were to accept the Debtor's interpretation of the Plan, the results flowing from such interpretation would set the world of bankruptcy topsy-turvy. This Court would not have approved a plan whereby the unsecured creditors faced the prospect of receiving no payment whatsoever in return

for their agreement to release third parties from their guaranties. Logic dictates that the unsecured creditors would not give up their right to enforce guaranties issued on behalf of the Debtor in exchange for no payment and no right to move for conversion of the case. In addition, such arrangement would violate the absolute priority rule because the unsecured creditors would receive nothing while equity retained its interest. Such an interpretation of the Plan would violate the Bankruptcy Code and would work a severe injustice on the unsecured creditor body, especially the Guaranty Creditors.

The Debtor's argument that the liquidation analysis in the Disclosure Statement disclosed the risk that the unsecured creditors could get nothing under the Plan is incorrect. The liquidation analysis merely confirmed that upon rejection of the Plan, the case would be converted and under Chapter 7, the unsecured creditors were not likely to receive anything. The effect of the language contained in the liquidation analysis was to convince the creditors that they were better off if the plan were confirmed. In fact, under the Debtor's analysis, the Guaranty Creditors would fare worse if the Plan were confirmed because these creditors would lose the right to enforce the guaranties and would receive nothing from the Debtor if the refinancing fell through. Surely this was not what the unsecured creditors understood their rights to be. Once the Debtor defaulted on their payments to the unsecured creditors, the creditors had the right, under the Plan, to declare a default. This is what the Plan provides and this is how the Plan is to be enforced.

The fact that the Plan provided for the unsecured creditors to have the right to declare an event of default under the Plan and move for conversion of the case if they were not paid supports this Court's interpretation of the Plan. The Debtor's argument that the unsecured creditors could have preserved their rights only by making the motion to convert the case between the "Funding Date" and the date of the sale of the Property is wholly unsupported by the clear terms of the Plan and the Disclosure Statement. Contrary to the Debtor's assertions, there was no "window" of time to declare an event of default under the Plan. Rather, the right to declare an event of default was triggered by a failure to comply with any of the events set forth in Art. III of the Plan. Clearly, one of the triggering events was the failure to pay the unsecured creditors on or before the "Funding Date". Such default occurred as of December 15, 1995 and continued through the date that Strocchia made this motion as no funding has taken place, nor can it take place. Because the creditors, including Lennar, deferred the exercise of their rights to enable the Debtor to obtain the funding as the Debtor repeatedly maintained it could, this deferral should not be held against them when they did act.

In addition to the existence of a material default under the Plan, other factors exist which warrant the conversion of this case for cause. The ten examples enumerated in Section 12(b) of the Code were not meant to be exhaustive. Legislative history indicates that this Section was meant to provide the Court with the means to convert or dismiss a case based on the facts peculiar to each case. H. Rep. 595, 95th Cong., 1st Sess. 406 (1977). There is compelling argument for converting this case. Permitting the entry of a final decree and closure of the case would be unjust and inequitable as to the Guaranty Creditors who would lose the rights they had bargained for without receiving anything of value in return.

Conversion is also justified based on the possibility that assets of the Debtor may have been diverted, unadministered assets may not have been collected, and some possible cause of action may be available against third parties pursuant to the Debtor's claim of damage to the estate. All of these factors support conversion of the case and not dismissal, as it would be in the best interest of creditors to have an independent determination made as to whether any or all of such claims have merit.

CONCLUSION

1. The Court has jurisdiction over this matter and the parties pursuant to 28 U.S.C. Sections 1334(a) and (b) and 28 U.S.C. Section 157.

2. This is a core proceeding pursuant to 28 U.S.C. Sections 157(b)(2)(A) and (O).

3. The Debtor's Plan has been substantially consummated by virtue of the sale of the Property to Lennar.

4. The Debtor has materially defaulted under the Plan due to its failure to make any payment to Class I or Class III creditors, and has no remaining assets sufficient to pay its creditors pursuant to its confirmed Plan.

5. Such material default warrants conversion of the case pursuant to Section 1112(b)(8) of the Bankruptcy Code.

6. In addition to the possibility of some recovery of assets on behalf of the creditors of this estate, conversion of the case instead of closure will prevent an injustice to the Guaranty Creditors who agreed to waive guarantees received from third parties in exchange for partial payment of their claims under the Plan.

7. It is in the best interest of all creditors of this estate to convert the case to a case under Chapter 7.