# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 00-30904

_____

IN THE MATTER OF:

THE BABCOCK AND WILCOX COMPANY; DIAMOND POWER INTERNATIONAL, INC.;
BABCOCK & WILCOX CONSTRUCTION CO., INC.; AND AMERICON, INC.,

Debtors.

CLYDE BERGEMANN, INC.,

Appellant,

VERSUS

THE BABCOCK AND WILCOX COMPANY; DIAMOND POWER INTERNATIONAL, INC.;
BABCOCK & WILCOX CONSTRUCTION CO., INC.; AMERICON, INC.;
AND CITICORP NORTH AMERICA, INC.,

Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

May 23, 2001

Before REYNALDO G. GARZA,
HIGGINBOTHAM, and SMITH,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Clyde Bergemann, Inc. ("Bergemann"), appeals the district court's affirmance of the bankruptcy court's order authorizing a post-petition financing agreement between The Babcock and Wilcox Company, Inc. ("B&W"), Diamond Power International, Inc. ("Diamond Power"), Babcock & Wilcox Construction Co., Inc., American, Inc. (collectively, the "debtors"), and Citicorp North America, Inc. ("CNA"). Finding no error, we affirm.

I.

Bergemann, a competitor of Diamond Power's, filed in 1999 a patent infringement suit, which is currently pending, seeking $52 million damages. In February 2000, the debtors filed voluntary chapter 11 petitions in response to unrelated mass tort litigation,[1] and the bankruptcy court administratively consolidated the debtors' cases. At the same time they filed the petitions, the debtors filed a motion (the "DIP financing motion") with the bankruptcy court seeking authorization under 11 U.S.C. §§ 105, 361, 362, 363, and 364(a) to enter into a post-petition financing arrangement with CNA, pursuant to a debtor-in-possession revolving credit facility (the "DIP financing agreement").

Under that agreement, the debtors received a $300 million line of credit and the ability to procure letters of credit, which allowed them

---

[1] Diamond Power, American, Inc., and Babcock & Wilcox Construction Co., Inc., are subsidiaries of B&W.

to continue doing business. The agreement gave CNA a security interest in the debtors' assets: Any funds borrowed under the line of credit would give rise to a claim against the assets of all debtors, which claim would be accorded super-priority administrative expense status against all unsecured creditors of each debtor.[2]

The bankruptcy court granted the DIP financing motion in an interim order, to which Bergemann objected on the grounds generally that the interests of other creditors would be unfairly subordinated to CNA and specifically that the assets of Diamond Power might be exposed to claims by CNA.[3] In response to

---

[2] The security interest is authorized by 11 U.S.C. § 364(c), which specifies that

[i]f the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debtSS

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

[3] Bergemann contends that Diamond Power owns substantial assets outright; Bergemann thus fears that the DIP financing agreement might allow creditors of the other debtorsSSincluding CNASSto reach assets that Diamond Power otherwise would
(continued...)

Bergemann's objection, the debtors amended the agreement to include a clause providing that, in the event Diamond Power (or any other debtor) makes payments to CNA in excess of funds received by that debtor from CNA, the debtor will receive a claim against all other debtors, subordinate only to CNA's claim.[4] Bergemann disagreed that this clause adequately protected its interests and continued to object to the DIP financing agreement.

In March 2000, after a hearing, the bankruptcy court issued a final order (the "DIP financing order") finding that the DIP financing agreement was necessary to the collective health of the debtors and that all the debtors would benefit from the agreement and

---

[3](...continued)

be able to use to satisfy a potential judgment in Bergemann's favor.

[4] As amended, the DIP financing agreement stipulates,

> To the extent any Debtor (a "Funding Debtor") makes aggregate payments to Lenders in excess of the aggregate amount of all loans and advances received by such Funding Debtor from Lenders after the Petition Date, then such Funding Debtor, after the payment in full of the Obligations and termination of the Commitments, shall be entitled to a claim under Section 364(c)(1) of the Bankruptcy Code against each other Debtor, in such amount as may be determined by the Bankruptcy Court taking into account the relative benefits received by each such person, and such claims shall be deemed to be an asset of the Funding Debtor; provided that such claim shall be subordinate and junior in all respects to the superpriority claims of the Lenders set forth herein.

authorizing the amended DIP financing agreement over Bergemann's objection. Bergemann appealed to the district court, which affirmed.

## II.

We review a bankruptcy court's conclusions of law *de novo* and findings of fact for clear error. *Traina v. Whitney Nat'l Bank*, 109 F.3d 244, 246 (5th Cir. 1997). "When the district court has affirmed the bankruptcy court's findings, the review for clear error is strict." *Id.*

## A.

Bergemann contends that the DIP financing order is improper because it substantively consolidates the debtors without following required procedures. Substantive consolidation is one mechanism for administering the bankruptcy estates of multiple, related entities,[5] and the issue of the device's propriety in a particular case normally arises from a bankruptcy court's express order of consolidation. Bergemann admits that the bankruptcy court did not purport substantively

---

[5] Because it is a judicial creation, the contours of substantive consolidation are indefinite; it "usually results in, *inter alia*, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the two companies for purposes of voting on reorganization plans." *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988) (citing 5 COLLIER ON BANKRUPTCY § 1100.06, at 1100-32 n.1 (L. King ed., 15th ed. 1988)). Fundamentally, "[s]ubstantive consolidation occurs when the assets and liabilities of separate and distinct legal entities are combined in a single pool and treated as if they belong to one entity." 1 WILLIAM L. NORTON, JR., NORTON BANKRUPTCY LAW AND PRACTICE § 20:3 (2d ed. 2000).

to consolidate the debtors' estates but instead argues that that court performed a "de facto substantive consolidation."[6] Bergemann cites no persuasive authority supporting that theory, however.[7] Because we do not agree that the court's order is a substantive consolidation, we do not address the issue whether the court conducted a sufficient inquiry into its necessity.

The bankruptcy court's order authorized only a pre-confirmation financing arrangement involving all the debtors and from which each of the debtors benefits.[8] As the district court

---

[6] The bankruptcy court did administratively consolidate the debtors' estates. Administrative consolidation is merely a procedural devise used to deal efficiently with multiple estates, however, while substantive consolidation affects the substantive rights of the parties and therefore is subject to heightened judicial scrutiny. 1 WILLIAM L. NORTON, *supra*, § 20:5.

[7] We addressed a similar theorySSalbeit under different factsSSin *Matter of Tex. Extrusion Corp.*, 844 F.2d 1142, 1161-62 (5th Cir. 1988), in which we refused to find a substantive consolidation where the bankruptcy court had entered no order of consolidation. Research reveals three cases mentioning the term "de facto substantive consolidation," of which only one is even remotely applicable to the facts of this case. In *In re Dynaco Corp.*, 158 B.R. 552, 553-54 (Bankr. D.N.H. 1993), the court refused to approve an emergency motion for post-petition financing in a parent/subsidiary bankruptcy, holding that the complexity of the financing transaction precluded approval of the agreement without a hearing. The court noted in passing that "[t]here are . . . provisions in the Post-Petition Credit Agreement that arguably may accomplish a *de facto* substantive consolidation of these estates." *Id.* The court failed, however, to describe the agreement in any detail or to identify the aspects of the agreement it found objectionable. Moreover, the court's statement, which arguably was *dictum*, was not supported by reasoning or citation of authority. We find such a conclusory pronouncement unpersuasive.

The other two cases to use the term bear no reasonable relationship to the facts of this case. In *In re Knobel*, 167 B.R. 436, 441-42 (Bankr. W.D. (continued...)

[7](...continued)
Tex. 1994), the court refused the Internal Revenue Service's invitation to interpret state community property laws as creating a *de facto* substantive consolidation of the bankruptcy estates of husband and wife debtors. In *In re Murray Industries.*, 119 B.R. 820, 826 (Bankr. M.D. Fla. 1990), the court opined in *dictum* that the sale of substantially all of the assets of a group of affiliated companies without allocating the purchase price among the various companies "appeared to be a de facto substantial consolidation."

[8] In support of the DIP financing motion, the debtors introduced an affidavit by B&W's Chief Restructuring Officer, who testified that the DIP financing agreement was critical to the continued vitality of each of the Debtors. Bergemann notes that the debtors failed to present evidence that Diamond Power, apart from the other debtors, needed to obtain credit under the DIP financing agreement and argues from that premise that the bankruptcy court erred in authorizing the agreement. In its written objection to the DIP financing motion, however, Bergemann failed to argue the need for any such individualized showing, other than stating that "Diamond Power did not require the $300 million in working capital" available under the agreement.

While probably true, that assertion fails to account for the other benefits described in the affidavit, including each debtor's need for letters of creditSSwhich the agreement would provideSSto (continued...)

4

noted, "[a]t most, what has happened here is that the lender-creditors under the DIP financing agreement could have access to the assets of debtors like Diamond Power in excess of the amount that Diamond Power benefitted from the agreement." Moreover, to the extent that Diamond Power is required to pay an amount disproportionate to funds it obtains through the agreement, its interests are protected by a super-priority claim against the other debtors under 11 U.S.C. § 364(c)(2). While the availability of a § 364(c)(2) claim may not fully protect Diamond Power's creditors,[9] it does maintain the critical distinction between Diamond Power's assets and liabilities and those of the other debtors, negating the lynchpin of any substantive consolidation order: The DIP financing order does not combine the assets or liabilities of the debtors and does not establish a common pool of funds to pay claims.

Moreover, the order fails to exhibit any other properties commonly characterizing substantive consolidation: It neither extinguishes inter-debtor claims nor combines each debtor's creditors for purposes of voting on a reorganization plan. Bergemann's claim has not been consolidated with those of the other debtors' unsecured creditors, and Bergemann's recovery has not been limited to a pro-rata

share equal to that of the other unsecured creditors. Almost none of the elements characteristic of a substantive consolidation order is present in the bankruptcy court's order. Thus, the order does not effect a substantive consolidation, *de facto* or otherwise.

### B.

Bergemann argues that the DIP financing order is invalid because it violates the absolute priority rule, embodied by 11 U.S.C. § 1129-(b)(2)(B), which outlines the requirements for confirming a chapter 11 plan:

> The court shall *confirm a plan* only if all of the following requirements are met:
>
> . . . .
>
> With respect to a class of unsecured claimsSS
>
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

(Emphasis added.) By its plain text, the absolute priority rule applies only to the confirmation of a chapter 11 planSSsection 1129 is entitled "Confirmation of plan"SSand therefore is inapplicable to the pre-

[8](...continued)
continue doing business. Weighing Bergemann's lone, unsupported assertion against the debtors' detailed affidavit, we cannot say the bankruptcy court committed clear error in finding that Diamond Power, like the other Debtors, would benefit under the agreement.

[9] Whether Bergemann is adequately protected pursuant to the bankruptcy court's order is not relevant to the issues addressed in this appeal. *See infra* note 12.

confirmation DIP financing order.

Bergemann avers that the bankruptcy court attempted "to do outside a plan what it cannot do in a plan," citing *In re Braniff Airways, Inc.,* 700 F.2d 935, 940 (5th Cir. 1983), for support. Bergemann reads *Braniff* too broadly, however. There the bankruptcy court approved a transaction under 11 U.S.C. § 363(b) that included the sale of substantially all the assets and the exchange of $2.5 million of the estate's cash for restricted travel scrip. This court reversed, finding that many of the activities contemplated by the transaction fell outside the provisions of § 363(b) authorizing the trustee to "use, sell or lease" the debtor's assets; moreover, we reasoned that the restricted nature of the travel scrip "had the practical effect of dictating some of the terms of any future reorganization plan," and concluded that after such a sale, "little would remain [of the estate] save fixed based equipment and little prospect or occasion for further reorganization. . . . [T]his [proposed sale] is in fact a reorganization." *Id.* at 940.

*Braniff* stands merely for the proposition that the provisions of § 363 permitting a trustee to use, sell, or lease the assets do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan. The DIP financing agreement contemplates neither of those functions; it merely allows the debtors to obtain the credit necessary to their continued vitality as going entities, pledging their assets as security for the credit. It neither changes the fundamental nature of the assets nor limits future reorganization options. *Braniff* does not compel application of the absolute priority rule

in this case.[10]

Bergemann cites two additional cases for the proposition that the absolute priority rule applies in the pre-confirmation context; neither is persuasive.[11] Instead, we agree that "[t]he absolute priority rule is a confirmation standard which does not apply to a pre-confirmation contested matter involving a debtor's request to obtain senior credit." *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 632 (Bankr. S.D.N.Y. 1992).[12] Neither the plain language of the statute nor any persuasive authority favors application of the absolute priority rule before plan confirmation.

---

[10] Notably, *Braniff* mentioned the absolute priority rule only when referring to the requirements the parties must meet in "[a]ny future attempts to specify the terms whereby a reorganization plan is to be adopted." *Braniff*, 700 F.2d at 940.

[11] *See In re Regency Holdings (Cayman)*, 216 B.R. 371, 374 (Bankr. S.D.N.Y. 1998) (mentioning the absolute priority rule only in passing, while discussing an asset transfer between a subsidiary and its parent); *In re Seaview Estates, Inc.*, 213 B.R. 427, 431-32 (Bankr. E.D.N.Y. 1997) (refusing to interpret a *confirmed* plan in a way that would violate the absolute priority rule).

[12] Furthermore, *495 Central Park* involved a financing transaction under § 364(d), which requires "adequate protection" of senior lienholders. In contrast, the financing agreement in this case is authorized by § 364(c), which does not require adequate protection. *See In re Garland Corp.*, 6 B.R. 456, 462 (1st Cir. B.A.P. 1980). Likewise, Bergemann is an unsecured creditor, not a senior lienholder, and thus would not be entitled to adequate protection even under § 364(d). *See In re Simasko Prod. Co.*, 47 B.R. 444, 448 (Bankr. D. Colo. 1985). Thus, the rationale of *495 Central Park* applies even more strongly to the financing agreement in this case.

6

Even were we persuaded that the absolute priority rule permissibly could be extended to pre-confirmation financing arrangements, we would decline to do so here. The debtors established the necessity of the agreement, which included a provision protectingSSat least in partSSthe interests of the existing creditors. In addition, Bergemann is an unsecured creditor that has not yet even prevailed on the suit underlying its claim. As the district court noted, "it is speculative whether Bergemann's claim will exist by the time this case reaches plan confirmation and whether the absolute priority rule would ever be invoked in this case." Thus, the bankruptcy court did not err in failing to apply the absolute priority rule.

## C.

Bergemann contends the financing agreement should not have been approved because it is effectively a fraudulent conveyance of Diamond Power's assets. The district court refused to address the merits of the argument, finding it waived. We agree.

To preserve an issue for appeal, a party must raise it before the trial court:

> Citing cases that may contain a useful argument is simply inadequate to preserve that argument for appeal; "to be preserved, an argument must be pressed, and not merely intimated." In short, the argument must be raised to such a degree that the trial court may rule on itSSa standard that clearly was not met in the instant case. The argument here was not even identified by name, much less advocated.

*Matter of Fairchild Aircraft Corp.*, 6 F.3d 1119, 1128 (5th Cir. 1993) (quoting *Hays v. Sony Corp.*, 847 F.2d 412, 420 (7th Cir. 1988)) (footnotes omitted).

Bergemann's brief to the bankruptcy court plainly argued two distinct theories: that the DIP financing agreement was a *de facto* substantive consolidation and that the agreement violated the absolute priority rule. Although Bergemann contends that it raised the issue of fraudulent conveyance sufficiently to avoid waiver, it can point to no assertion before the bankruptcy court that meets *Fairchild Aircraft*'s strict standard. Bergemann admits that it referred to the issue only in passingSSas part of its substantive consolidation argumentSSbut reasons nonetheless that it preserved the issue by quoting two cases in its bankruptcy court brief: One expressed concern that "an overaggressive approach [to substantive consolidation] could lead to a series of fraudulent conveyances being considered a commingling of assets that may justify substantive consolidation";[13] the other stated that "[t]ransfers made to benefit third parties

---

[13] *In re Creditors Serv. Corp.*, 195 B.R. 680, 689 n.5 (Bankr. S.D. Ohio 1996). The text quoted in Bergemann's brief to the bankruptcy court, while mentioning the terms "fraudulent conveyance" and "substantive consolidation," opined only that an overbroad view of the scope of substantive consolidation presents the danger that multiple fraudulent conveyances might serve as the basis for an improper substantive consolidation. Notably, neither the quoted text nor any other part of the opinion stated that an alleged substantive consolidation effectsSSor even presents the danger ofSSa fraudulent conveyance. The mere fact that the terms "fraudulent conveyance" and "substantive consolidation" appear in the same quoted sentence does not preserve the issue of whether the DIP financing order is a fraudulent conveyance.

are clearly not made for 'fair consideration,'"[14] which statement Bergemann contends is the definition of a fraudulent conveyance.

Neither quotation identified the issue of fraudulent conveyance sufficiently for the bankruptcy court to rule on itSSone quotation used the term "fraudulent conveyance," but in an irrelevant context, and the other failed even to identify the relevant legal theory. Moreover, the quotations were accompanied by no discussion regarding how that theory applied to the DIP financing agreement. Instead, the unexplained quotations were buried in a section supporting a related, but distinct, argument.

The bankruptcy court could not have been expected to rule on the issue on the basis of those quotations alone. Bergemann waived the issue of whether the DIP financing agreement is a fraudulent conveyance.[15]

AFFIRMED.

---

[14] *In re Lawrence Paperboard Corp.*, 76 B.R. 866, 874 (Bankr. D. Mass 1987) (quoting *Ruben v. Mfrs. Hanover Trust*, 661 F.2d 979, 981 (2d Cir. 1981)).

[15] Even if Bergemann had not waived the issue of fraudulent conveyance, its argument, which is premised on the proposition that Diamond Power received no benefit from the DIP financing agreement, is without merit. As discussed *supra* note 8, the bankruptcy court properly found as a matter of fact that Diamond Power needed and benefited from the agreement.